PARTIDO NUEVO PROGRESISTA *v.* JUNTA ESTATAL DE ELEC-
CIONES; PARTIDO DEL PUEBLO *v.* JUNTA ESTATAL DE ELEC-
CIONES; PARTIDO FEDERAL UNIONISTA AGRÍCOLA, inter-
ventor en ambos recursos.

*Números:* 16, 17     *Resueltos:* 12 de agosto de 1968

*Jorge Luis Córdova Díaz, Francisco Ponsa Feliú, Enrique Córdova Díaz, Carlos Romero Barceló, Ángel Viera Martínez* y *Juan Antonio Palerm,* abogados del Partido Nuevo Progresista; *Rafael A. Rivera Cruz, Procurador General, J. F. Rodríguez Rivera, Subprocurador General,* y *Samuel R. Quiñones,* abogados de la Junta Estatal de Elecciones; *Vicente L. Giménez,* miembro de la Junta Estatal de Elecciones, en representación del Partido del Pueblo; *Ángel Roberto Díaz,* abogado del "Partido Federal-Unionista-Agrícola".

DECISIÓN DEL JUEZ PRESIDENTE SEÑOR NEGRÓN FERNÁNDEZ.

## I

Estos recursos presentan una controversia política que viene al foro judicial de un foro político-administrativo—la Junta Estatal de Elecciones—cuyas decisiones deben fundarse en la vigencia plena del estado de Derecho y en la protección de los derechos políticos y sociales que entran en juego en la administración de la Ley Electoral, y no en preferencias políticas—a pesar de su organización eminentemente política.

En la función del juzgar, ya sea en juntas y otros organismos administrativos con atribuciones cuasi-judiciales, como en el foro propiamente judicial, es a los hombres del Derecho a quienes corresponde superar, más que nunca—con ponderado juicio y libertad de conciencia en sus determina-

ciones judiciales—las histerias públicas que las pasiones políticas generan, asumiendo la responsabilidad de reafirmar los derechos del hombre en el orden jurídico-constitucional, para dar al imperio de la Ley sentido válido de utilidad social.

## II

Para un mejor entendimiento de las cuestiones aquí envueltas es de rigor hacer una relación—la más breve posible —de los antecedentes que forman parte del historial de estos recursos, de las disposiciones de ley aplicables, y de otros hechos y actuaciones que surgen del récord elevado por la Junta al Juez Presidente bajo las disposiciones de la Sec. 13d de la Ley Electoral, o que son propiamente de conocimiento judicial.

El 23 de julio de 1967 se celebró en Puerto Rico un plebiscito para que el pueblo de Puerto Rico expresara su voluntad sobre su status político, conforme a las disposiciones de la Ley Núm. 1 de 23 de diciembre de 1966, según quedó subsiguientemente enmendada. Se dispuso por el Art. 1 de dicha ley, entre otras cosas, que "Dicho plebiscito se celebrará en forma libre, imparcial y democrática para que los electores capacitados para votar en el mismo seleccionen entre: (a) Estado Libre Asociado (b) Estadidad (c) Independencia."

Por el primer párrafo del Art. 3, se dispuso que:

"Salvo lo dispuesto expresamente en esta ley, la votación en el plebiscito se llevará a efecto con arreglo a las disposiciones de la Ley Electoral, la cual se entenderá que es supletoria a la presente ley, y de conformidad con las reglas y reglamentos establecidos en el pasado por la Junta Estatal de Elecciones y que sean compatibles con esta ley o con las reglas y reglamentos que establezca la Junta Estatal."

Por el Art. 4 se establecieron los requisitos y condiciones para que cada partido político que tuviera en su programa alguna de las fórmulas de status, participara activamente

en el plebiscito en apoyo de dicha fórmula como representante exclusivo de la misma; y proveyó, en su defecto, un mecanismo para la coparticipación de otras agrupaciones, organizaciones o entidades que, sin tener categoría de partidos políticos, desearen concurrir a defender alguna fórmula de status si el partido que la tenía en su programa no notificaba al Superintendente General de Elecciones, dentro de 30 días de aprobada la ley, su propósito de participar en apoyo de la misma, pero lo hacía dentro de los siguientes 30 días de expirado dicho plazo; o de sustitución, si se abstenía por completo dicho partido de participar en el plebiscito. Para tal caso se autorizó la designación de un Comité Directivo representativo de la fórmula de status correspondiente, en la forma allí provista.

Por el Art. 19 se dispuso que por el Superintendente se procedería a adjudicar a cada fórmula de status, por sorteo, (1) una palma real, (2) una rueda de carreta, (3) una montaña. Se dispuso también por dicho artículo que "no se incorporará a la papeleta ningún emblema oficial característico de un partido político".[1]

Por el Art. 26 se dispuso que:

"Las insignias que aparezcan en las papeletas que se usen en el plebiscito no podrán utilizarse por ningún candidato o partido como tal, en papeleta de votación alguna, desde la fecha de aprobación de esta ley hasta diez años después de celebrado el plebiscito."

Y por el Art. 86:

"Será ilegal que cualquier persona y/o cualquier partido político u organismo del mismo, agrupación, organización o entidad

---

[1] "Artículo 95(k) 'Emblema oficial característico'.—Toda divisa, imagen, tipo, figura, signo, señal, dibujo, distintivo, representación o reproducción pictórica o fotográfica, bandera, escudo, nombre, lema, letra o combinación de letras, palabra o combinación de palabras, o cualquier otro material, que se hubiere registrado, con anterioridad a la aprobación de este Capítulo hasta el cierre de los colegios para el escrutinio plebiscitario, en la Junta Estatal de Elecciones, como emblema oficial de cualquier partido político inscrito o en proceso de inscripción."

política, comité representativo de una de las fórmulas enumeradas en el Artículo 1 de esta ley o comité afiliado o subsidiario de dicho comité representativo, y cualquier persona que actúe en representación o en nombre de dichas entidades, use o utilice cualquier emblema oficial característico, según se define en este Capítulo, en apoyo o en contra de cualquiera de las fórmulas enumeradas en el Artículo 1 de esta ley, dentro de los colegios de votación o a un radio de menos de cien (100) metros de dichos colegios de votación."

Se dispuso, además, por dicho artículo, que cualquier violación a lo anteriormente dispuesto constituiría delito menos grave castigable con la pena allí provista.

Al plebiscito concurrieron, por la fórmula Estado Libre Asociado contenida en su programa, el Partido Popular Democrático; por la fórmula Estadidad concurrieron siete agrupaciones, integrándose—conforme a las disposiciones de la propia Ley—un Comité Directivo representativo de dicha fórmula; y por la fórmula Independencia concurrieron dos agrupaciones, constituyéndose también un Comité Directivo representativo de la misma.

. A los fines del plebiscito, conforme a las disposiciones pertinentes de la Ley, la Junta Estatal adjudicó, por sorteo, la insignia de la palma real a la fórmula Estadidad, la insignia de la rueda de carreta a la fórmula Independencia y la insignia de la montaña a la fórmula Estado Libre Asociado. Así quedaron impresas las papeletas de votación que se usaron en el plebiscito, cumpliéndose además en dicha impresión con los otros requisitos dispuestos por la referida Ley.

### III

En carta fechada el 1ro. de agosto de 1967, que fue recibida en la Junta Estatal de Elecciones a las 12:31 P.M. de ese día, Modesto Rivera Ramos, firmando como Presidente de una agrupación política que denominó Partido Federal-Unionista-Agrícola, se dirigió al Superintendente General de

Elecciones para que dicha Junta tomara "conocimiento oficial del nombre e insignias que estoy utilizando en el proceso de inscripción de un nuevo partido político por petición", que llevaría el nombre ya indicado, y que tendría como insignias, una mata de guineo, un árbol de flamboyán, un árbol de café y dos palmas de coco, que en cuatro dibujos en secuencia horizontal, y en ese orden, incluyó como parte de dicha carta. Indicó en ésta que comenzaría a radicar en la Junta "las peticiones de inscripción del nuevo partido por petición tan pronto recibamos las mismas de los precintos electorales donde se ha iniciado el trabajo, comenzando con el precinto número uno de San Juan, y continuando con los demás precintos de Puerto Rico." Terminó solicitando que para juramentar las peticiones de inscripción del nuevo partido designara dos notarios de entre los siguientes cuatro nombres que incluyó en su carta: licenciados Gonzalo Ardín Román, Ángel Roberto Díaz, Ángel L. Delgado y Arturo Ortiz Toro.

De la fotocopia de dicha carta elevada como parte del récord de la Junta así como de la papeleta de muestra correspondiente a las elecciones generales de 3 de noviembre de 1964 que también forma parte del récord, los primeros tres de los cuatro dibujos sometidos como emblemas en la referida carta, son los mismos que se usaron en dicha papeleta electoral como suyos por el representante por acumulación Santiago Iglesias Silva (mata de guineo), el representante por acumulación Aguedo Mojica (árbol de flamboyán) y el senador por acumulación Ramiro L. Colón (árbol de café), evidentemente recortados o fotocopiados de dicha papeleta y superpuestos en la citada comunicación.

Con carta fechada el 2 de agosto de 1967 y recibida en la Junta a las 12:08 P.M. de ese día, Emilio Matos Ríos, firmando como presidente interino de una agrupación política que denominó Partido Progresista Federado, acompañó 42 peticiones de "votantes Bona-fide del Precinto electoral

de Culebra solicitando la inscripción del Partido Político 'Progresista Federado' ''. (²) Le acompañó también con dicha comunicación el registro de las declaraciones juradas ante el notario Juan A. Palerm por los electores peticionarios. En dicha comunicación se indicó que las insignias de dicho partido serían una palma real, una palma de cocos y dos ramas de palma en forma de v. Las peticiones de inscripción, mimeografiadas, contenían en su parte superior, en ese orden, dibujos también mimeografiados de dichos emblemas.

La fotocopia del recibo expedido a nombre de la Junta por el señor Salvador Díaz confirma que las 42 peticiones del precinto de Culebra a nombre de dicho partido, se recibieron el 2 de agosto de 1967 a las 12:08 de ese día.

Con carta al Superintendente de fecha 2 de agosto de 1967 firmada con el nombre de Modesto Rivera Ramos, como presidente del Partido Federal-Unionista-Agrícola, pero seguida de la nota "por Ángel Roberto Díaz, oficial-notario que tomó los juramentos" se acompañaron las peticiones de Blanca González Vélez y Teddy Libertad Cancel González del precinto electoral San Juan I. Estas dos peticiones, suscritas en San Juan ante el notario Arturo Ortiz Toro el 1ro. de agosto de 1967, fueron recibidas en la Junta a la 1:38 P.M. del día 2 de agosto, según fotocopia del recibo en autos.

Con carta al Superintendente de fecha 3 de agosto de 1967 se acompañaron cuatro peticiones de inscripción del referido partido en el precinto de Culebra. Estas cuatro peticiones aparecen suscritas en Culebra ante el notario Ángel Roberto Díaz el 1ro. de agosto de 1967.

Las cuatro peticiones de referencia—de Herminia Santiago Navarro, Isabel Navarro Ramos, Inocencia Soto Ayala

---

(²) El 17 de abril de 1968, Anastasio Soto Ayala, en su carácter de elector votante del Precinto de Culebra, suscribió declaración jurada recusando las 42 peticiones de inscripción de la agrupación Partido Progresista Federado en dicho Precinto, por ser nulas *ab initio*.

Nada hay en el récord que indique que esta recusación fuere considerada siquiera por la Junta.

y Nicomédes Ayala Serrano—además de nominar candidatos para Gobernador, Comisionado Residente, Senadores y Representantes por Acumulación y de Distrito, nombraban *cinco* candidatos para Asambleístas Municipales (en vez de cuatro, según dispone la Ley Municipal) y no proponían candidato alguno para Alcalde. Uno de los candidatos a la Asamblea Municipal, cuya petición de nombramiento de candidatos está entre esas cuatro, declaró en la petición que no sabía leer; y no firmó su juramento en la misma, sino que hizo una cruz.

Se designaban en esas cuatro peticiones a Modesto Rivera Ramos (Presidente), Juan Velázquez Zayas (Vice Presidente), Agustín Bayón Santiago (Secretario) y Aminta Rosario Troche (Tesorera) para constituir el Organismo Directivo Central de dicha agrupación. Todos eran residentes de San Juan, según se hizo constar.

Con carta de 5 de agosto de 1967 se remitieron 21 peticiones más a nombre de dicha agrupación, suscritas por los peticionarios los días 4 y 5 de dicho mes en Culebra, ante el Notario Ángel Roberto Díaz. Proponían los mismos candidatos que las anteriores cuatro y el mismo Organismo Directivo Central. Hasta esa fecha la referida agrupación Partido Federal-Unionista-Agrícola había presentado en la Junta Estatal de Elecciones, dos (2) peticiones nombrando candidatos para el precinto de San Juan I y veinticinco (25) peticiones nombrando candidatos para el precinto de Culebra. (³)

Con carta de fecha 27 de marzo de 1968 al Superintendente General de Elecciones, la referida agrupación acom-

---

(³) En Culebra, donde el número total de electores que votaron para el cargo de Gobernador fue de 317, se necesitan 32 peticiones válidas— el 10%—para poder nominar candidatos locales. El Superintendente General de Elecciones declaró el 14 de marzo de 1968 ante el Tribunal Superior de Bayamón, según el récord elevado por la Junta, que las 25 peticiones de la agrupación Partido Federal-Unionista-Agrícola para el precinto de Culebra habían sido procesadas y aceptadas, y que requiriendo la ley sólo diez y seis (16), o sea el 5%, dicha agrupación "para los fines de la Junta está inscrita en el Precinto de Culebra y como tal tiene que ir a la papeleta."

pañó. once (11) peticiones adicionales para el precinto de Culebra, suscritas el 26 del propio mes ante el Notario Francisco Navarro Mendía. Dos de los once peticionarios— Ada Laura Rodríguez Díaz y Anastasio Soto Ayala—ya habían suscrito el 1ro. de agosto de 1967 peticiones nombrando candidatos por la misma agrupación y para el mismo precinto ante el notario Ángel Roberto Díaz, y están entre las radicadas en la Junta el 5 de agosto de 1967, por lo cual el número total de electores suscribiendo peticiones es de treinta y cuatro (34) y no de treinta y seis (36). Hay, de otro lado, una diferencia entre las primeras 25 peticiones y las once siguientes, consistente en que en estas últimas se nombra candidato a Asambleísta Municipal de Culebra a *Ana* Santiago Navarro y no a *Herminia* Santiago Navarro como en las primeras veinticinco, y ni Herminia ni Ana— que no tendrían separadamente suficientes electores para completar las 32 peticiones necesarias para ser nominadas— firman el juramento de aceptación requerido por la ley, sino que el que fue radicado en la Junta el 31 de mayo de 1968 fue el de *María* Santiago Navarro, que no aparece nominada en petición alguna.

Isabel Navarro Ramos, que suscribió una petición de inscripción de candidaturas a nombre del Partido Federal-Unionista-Agrícola el 1ro. de agosto de 1967 suscribió otra con otros candidatos el 2 del mismo mes a nombre del Partido Progresista Federado; Elvira Romero de García, Antonio Ramos Román y Leonides Espinosa Aléstica, que suscribieron peticiones a nombre del Partido Progresista Federado el 2 de agosto de 1967, suscribieron otras a nombre del Partido Federal-Unionista-Agrícola, el 4 de agosto los dos primeros y el 5 de agosto el último.

El Superintendente General de Elecciones certificó, con fecha 5 de junio de 1968, que la agrupación política denominada Partido Federal-Unionista-Agrícola tiene 36 peticiones de inscripción de electores para el precinto electoral de

Culebra, "lo que la cualifica como partido local y con derecho a ir a la papeleta electoral en las elecciones generales del 1968 en dicho Precinto Electoral"; y con fecha 29 de julio de 1968 certificó que ninguna de las peticiones de candidaturas radicadas por dicha agrupación política fue anulada por la Junta Estatal de Elecciones "ya que se procesaron las mismas y todas las personas que juraron y firmaron éstas son electores legales del Precinto Electoral de Culebra y dichas peticiones cumplen con todos los requisitos que la Ley exige".

Por carta de 21 de agosto de 1967, Magdalena López, como Secretaria de la agrupación política denominada Partido Progresista Federado—que además de haber radicado ante la Junta Estatal de Elecciones cuarenta y dos (42) peticiones nombrando candidatos para el precinto electoral de Culebra, según anteriormente indicamos, radicó 870 peticiones para el precinto de Cataño, que fueron aceptadas, conforme a declaración del Superintendente que obra en autos—solicitó de la Junta Estatal que dejara como única insignia de dicha agrupación la palma de cocos,[4] y se eliminara la palma real y las dos ramas de palma que había venido usando hasta entonces en las peticiones de inscripción

---

[4] No hacemos aquí mención, por ser innecesario, de la solicitud sobre cambio de nombre de la agrupación. En dicha carta solicitó, además, que se sustituyera la directiva que aparecía en las peticiones de inscripción radicadas para los precintos de Cataño y Culebra, en la siguiente forma:

"A—Presidente, Luis A. Ferré, en sustitución de Emilio Matos Ríos
B—Primer Vice-Presidente, Justo A. Méndez en sustitución de Antonio Roig Ferré
C—Añadir cuatro Vice-Presidentes que serán
  Lcdo. Carlos Romero Barceló
  Lcdo. Jorge Luis Córdova Díaz
  Lcdo. Jesús Hernández Sánchez
  Dr. Hernán Padilla
D—Secretario General, Lcdo. José Menéndez Monroig en sustitución de Magdalena López
E—Tesorero, Federico Torres Campos, en sustitución de Gabriel Cánovas."

de candidatos. La Junta rechazó esta solicitud, entre otras razones a las que es innecesario hacer referencia ahora, por el fundamento de que la insignia propuesta "viola las disposiciones de la ley que prohiben expresamente el que cualquier agrupación adopte en todo o en parte un nombre o insignia que violen las disposiciones claras de las Secs. 37 y 42 de la Ley Electoral vigente."

Emilio Matos Ríos instó recurso de revisión contra la decisión de la Junta para ante el Tribunal Superior y, luego de varios incidentes, la Sala de Bayamón, por voz del Juez Jorge Meléndez Vela, dictó sentencia el 13 de febrero de 1968 declarando con lugar el recurso, ordenando a la Junta la inscripción de la agrupación política a que pertenecía Matos Ríos, con el nombre propuesto y la insignia de la palma de cocos, una vez se radicaran en la Junta las declaraciones juradas de los miembros de la nueva directiva nombrada aceptando tal designación, y por los miembros del Organismo Directivo Central originales certificando bajo juramento los acuerdos tomados por ellos y a que se refería la carta de 21 de agosto de 1967 de la anterior secretaria Magdalena López. En la opinión emitida por dicho magistrado declaró que la insignia de la palma de cocos en forma alguna violaba la Sec. 26 de la Ley de Plebiscito ni la Sec. 37 de la Ley Electoral en la parte pertinente.

Siguieron varios incidentes posteriores a la sentencia, ante el propio Tribunal: Solicitud de Intervención de Modesto Rivera Ramos (5) a nombre de la agrupación Partido Federal-Unionista-Agrícola, y Moción para dejar sin efecto la sentencia, a nombre de la Junta Estatal de Elecciones; y contra resoluciones adversas en ambas instancias, acudieron uno y

---

(5) No haremos mención, en el curso de esta decisión, del otro peticionario en la solicitud de intervención y en el recurso de *Certiorari* O-68-120 ante el Tribunal Supremo, por haberse tornado académica su instancia durante el procedimiento.

otra al Tribunal Supremo en los recursos de *Certiorari* O-68-120 y O-68-142.

Por sentencia del Tribunal Supremo de 28 de junio de 1968 se anuló el auto de *Certiorari* expedido en el recurso O-68-120 para revisar la negativa del Tribunal Superior de Bayamón a permitir la intervención de Modesto Rivera como Presidente del Partido Federal-Unionista-Agrícola; y en el *Certiorari* O-68-142, expedido a instancia de la Junta Estatal de Elecciones, se anuló la resolución recurrida de 6 de mayo de 1968 y se decretó que la sentencia del Tribunal Superior de Bayamón de 13 de febrero de 1968 era "ineficaz, carente de efecto y no ejecutable". Se hizo constar expresamente en la opinión del Tribunal Supremo que dicha decisión "en nada prejuzga en un sentido u otro, el derecho que pueda tener o no el Partido Nuevo a reclamar ante la Junta, allí representado, el uso de la palma de cocos como emblema en la papeleta electoral, ni prejuzga en forma alguna la decisión que pudiera hacer la Junta, si tal solicitud se hiciere."

## IV

A fines de agosto de 1967, la agrupación Estadistas Unidos que participó en el plebiscito celebrado el 23 de julio de ese año en apoyo de la fórmula Estadidad, inició bajo el nombre de Partido Nuevo y con una herradura por insignia, la inscripción separada de un partido por petición para concurrir a las elecciones generales de 1968.

El 11 de septiembre de 1967 radicó en la Junta Estatal de Elecciones 310 peticiones correspondientes al precinto electoral de Cayey. Terminó su proceso de inscripción y en el mes de enero de 1968 quedó certificado como partido por petición, con derecho a nominar candidatos en todos los precintos de la Isla y a disfrutar de los demás derechos que la ley le reconoce a los partidos por petición.

Según declaración prestada en el Tribunal Superior de Bayamón por el Presidente del Partido Nuevo en uno de los incidentes a que antes hemos hecho referencia, dentro del recurso de revisión instado por Emilio Matos Ríos—y que forma parte del récord en el presente recurso—la idea de formar un partido político por petición surgió en los Directores de Estadistas Unidos a raíz de celebrado el plebiscito, idea que fue ratificada en asamblea general de dicha agrupación; y la gestión inicial de inscribir en Culebra el Partido Progresista Federado fue parte del mismo movimiento, para evitar que el Partido Estadista Republicano, que no concurrió al plebiscito, obtuviera la insignia de la palma de cocos a través de un partido local de su hechura, como el Partido Federal-Unionista-Agrícola, en un movimiento por sorpresa que no tenía otro propósito que impedir que Estadistas Unidos, al constituirse en un partido por petición, la adoptara como su insignia, "la cual tenía gran importancia para nosotros."

## V

En carta de fecha 26 de marzo de 1968 radicada en la Junta Estatal de Elecciones el 5 de abril siguiente, el Secretario General del Partido Nuevo solicitó de la Junta, en virtud de documentos que acompañó a su comunicación, el cambio del nombre Partido Nuevo a Partido Nuevo Progresista y el cambio de insignia de la Palma de Cocos, sobre la cual aparecería el lema "Seguridad, Igualdad y Progreso".

En carta de 8 de abril de 1968 el Superintendente General de Elecciones contestó al Secretario General del Partido Nuevo que por razón de estar pendiente en el Tribunal Superior, Sala de Bayamón, el recurso instado por Emilio Matos Ríos contra la Junta Estatal de Elecciones,—al cual antes hemos hecho referencia—estimaba que sería improcedente en esa fecha traer a la consideración de la Junta su solicitud.

Una vez resueltos por el Tribunal Supremo los recursos de *Certiorari* O-68-120 y O-68-142 con los pronunciamientos anteriormente apuntados, solicitó el miembro suplente del Partido Nuevo en la Junta Estatal de Elecciones que ésta se reuniera para considerar la petición de cambio de nombre y de insignia que había quedado sin resolver.

## VI

En reunión celebrada por la Junta el 8 de julio de 1968 para considerar el pedido del Partido Nuevo, se acordó autorizar el cambio de nombre al de Partido Nuevo Progresista, pero quedó sin resolver la solicitud de cambio de insignia, por estimar el Superintendente, luego de someter dicho asunto a votación y no haber mediado unanimidad entre los miembros de la Junta representantes de los partidos políticos, que no debía emitir su voto sobre la legalidad o ilegalidad del uso de la palma de cocos en la papeleta electoral de 1968, por estar *sub-judice* la cuestión en un procedimiento de sentencia declaratoria iniciado en el Tribunal Superior, Sala de San Juan, por el Partido Estadista Republicano.

Inconformes los representantes del Partido Nuevo Progresista y del Partido del Pueblo en la Junta, apelaron para ante el Juez Presidente bajo las disposiciones de la Sec. 13d de la Ley Electoral vigente. Luego de oir a las partes en vista celebrada el 19 de julio pasado, devolvimos el caso a la Junta con instrucciones de que procediera a emitir su decisión sobre la legalidad o ilegalidad del uso de la palma de cocos como insignia en la papeleta electoral; y a la vez resolver las reclamaciones opuestas que a la del Partido Nuevo Progresista pudieren hacer el Partido del Pueblo, o cualquier otra agrupación política, para el caso de que finalmente se resolviera que el uso de dicha insignia era legal.

En reunión de la Junta celebrada el 22 de julio, no habiendo unanimidad entre los miembros representantes de los partidos políticos sobre ninguna de las dos cuestiones, el Superintendente, conforme al mandato de la ley, emitió su decisión sosteniendo que el uso de dicha insignia era ilegal; y que en caso de que en apelación se resolviese que no lo era, dicha insignia correspondería, por prioridad, a la agrupación denominada Partido Federal-Unionista-Agrícola.

De nuevo acudieron en apelación ante el Juez Presidente, dentro de estos propios recursos, el Partido Nuevo Progresista y el Partido del Pueblo. La agrupación Partido Federal-Unionista-Agrícola pidió intervención, que le fue concedida, y el 30 de julio se celebró una vista en la que todas las partes interesadas fueron oídas.

## VII

La Sec. 37 de la Ley Electoral vigente (16 L.P.R.A. sec. 112), en lo pertinente dispone: ". . . Ninguna agrupación política que quiera inscribir una candidatura o constituirse en partido por petición usará o adoptará en todo o en parte un nombre o emblema que previamente se hubiere usado o adoptado *por cualquier otro partido político* o ningún nombre o emblema en *todo o en parte similar a un nombre o emblema previamente usado o adoptado por otro partido político*, si tal otro partido todavía reclamare y usare dicho nombre o emblema. *Tampoco se usará o adoptará ningún nombre, emblema o insignia cuyo uso, para fines electorales, esté prohibido por ley.*" (Énfasis nuestro.)

Y la Sec. 42 de la propia ley (16 L.P.R.A. sec. 141) provee: "*Ningún partido político* adoptará como nombre o emblema un nombre o emblema que se hubiese usado o adoptado previamente *por otro partido político*, en todo o en parte, si ese otro partido todavía reclama y usa dicho nombre o emblema. . . ." (Énfasis nuestro.)

La primera cuestión a resolver en estos recursos es si habiendo aparecido en la papeleta plebiscitaria la *palma real* como la insignia adjudicada a la fórmula Estadidad, la disposición del Art. 26 de la ley de plebiscito que prohibe que tal insignia se utilice por candidato o partido alguno como tal en papeleta de votación alguna hasta 10 años después de celebrado el plebiscito, impide que un partido político use como su insignia la palma de cocos, que no es la palma real, en la papeleta electoral de 1968.

La decisión del Superintendente contraria al uso de dicha insignia—decisión que conforme a la ley es la decisión de la Junta—se funda en que "la política pública es contraria a que se utilicen las insignias y los nombres de los partidos políticos con el propósito de confundir a los electores", y que por lo tanto, la Ley de Plebiscito de 1966 debe interpretarse en armonía con dicha política pública, en observancia del Art. 18 del Código Civil, prescriptivo de que "Las leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras. . . ." Luego de hacer referencia en Voto Explicativo a la disposición de la Sec. 35 de la antigua Ley Electoral de 1906, según enmendada en 1908, que establecía que "No se empleará ninguna divisa que, a juicio del Secretario [de Puerto Rico] se asemeje demasiado a la que haya adoptado cualquier otro partido", y de citar las Secs. 37 y 42 de la Ley Electoral vigente, que arriba hemos transcrito, se refirió a la exposición de motivos de la Ley Núm. 138 de 30 de junio de 1961, enmendatoria del propio Art. 42 de la Ley Electoral, que amplió y extendió las restricciones hasta entonces existentes en cuanto al uso por los partidos políticos de divisas en la papeleta electoral, todo ello para establecer su aserto sobre la política pública en cuanto a ese extremo. Creo oportuno reproducir aquí la Exposición de Motivos que cita el Superintendente en su voto:

"Las divisas que se usan en la papeleta electoral tienen el propósito de permitir al votante, especialmente al que no sabe leer y escribir, que identifique debidamente el partido al cual interesa otorgarle su voto. Por ser este el propósito de su uso, tales divisas deben escogerse de conformidad con restricciones estatutarias aprobadas al efecto, para impedir que el votante pueda confundirse o que se conceda indirectamente una ventaja a alguno de los partidos participantes, mediante el uso de una divisa en particular que tenga para el votante connotaciones distintas a las que supone el derecho al sufragio que está próximo a ejercer.

Para garantizar que los votantes no resultarán confundidos o coaccionados por motivaciones ajenas al proceso electoral propiamente, resulta necesario incluir en la Sección 42 de la Ley núm. 79, aprobada en 25 de junio de 1919, según ha sido enmendada, conocida como 'Ley Electoral', normas más abarcadoras que las que hoy consigna el estatuto. Es ése el propósito de esta ley." (6)

---

(6) La enmienda introducida a la Sec. 42 de la Ley Electoral en virtud de la Ley Núm. 138 de 30 de junio de 1961, que contiene dicha Exposición de Motivos, agregó a la relación de las insignias que no podrían adoptar los *partidos políticos* (hasta entonces la insignia que se hubiese usado o adoptado previamente por otro partido político, en todo o en parte, si ese otro partido todavía reclamaba y usaba dicho nombre o insignia y la bandera o el escudo de armas de los Estados Unidos o del Estado Libre Asociado de Puerto Rico) las siguientes:

". . . (1) ningún símbolo, imagen, tipo, figura, insignia, signo, señal, dibujo, distintivo, representación o reproducción pictórica o fotográfica, emblema, bandera, escudo, nombre, lema, letra o combinación de letras, palabra o combinación de palabras, que cualquier iglesia o secta, denominación, orden o congregación religiosa, establecida en Puerto Rico, o cualquier logia, agrupación fraternal, profesional, cívica o social, establecida en Puerto Rico, o cualquier organización, agrupación, asociación, o entidad de fines religiosos, establecida en Puerto Rico, haya usado o use como distintivo o en sus ritos, servicios, reuniones, actividades, ceremonias, enseñanzas, adoctrinamiento o propaganda; (2) Divisa alguna que se asemeje o parezca, en todo o en parte, a lo enumerado en el apartado anterior; . . . ."

Esa misma relación se agregó a las insignias hasta entonces prohibidas a los candidatos por acumulación.

Como puede verse, todas las insignias incluidas en la nueva y abarcadora prohibición en nada se referían a criterios políticos o a cuestiones que propiamente pudieran relacionarse con una contienda electoral.

Pasa luego el Superintendente a afirmar que el historial legislativo a que se ha referido "demuestra la honda preocupación del legislador porque en las campañas políticas y en las elecciones no se utilicen nombres o insignias iguales o parecidas a las de otros candidatos y partidos"; y que "aun cuando la insignia que representó en el plebiscito a la alternativa estadidad federada se le designó 'palma real' por la propia ley, la realidad es que para el elector común, los dibujos representativos de una palma real y una palma de cocos son tan similares que fácilmente pueden confundirse." Expresó su criterio de que "esta similitud coloca a ambas insignias dentro del espíritu y la prohibición de la sección 37 de la Ley Electoral y del citado Art. 26 de la ley de plebiscito", y sostuvo que esa política pública "de que no se propicie la confusión en el electorado, es un claro mandato que no cabe frustrar mediante sutilezas." Haciendo referencia al *dolus malus* del derecho romano, una de cuyas formas se conocía como *subtilitas* (la adhesión a la letra estricta de la ley con el fin de hacer de ella un medio para obtener una ventaja indebida) afirma que "pretender alegar y establecer diferencias donde no las hay y frustrar de este modo el verdadero sentido justo del proceso electoral es condenable."

Expresa también el Superintendente en su voto, que "el emblema de la palma—dada aún la sutileza de si se trata de la palma de cocos a distinción de la palma real—tiene una relación directa e inseparable con el uso electoral a que se le destinó en el pasado plebiscito, lo cual puede dar lugar a una asociación inconsciente de su significado en el plebiscito, por parte del elector, en una elección general, la cual tiene fines y propósitos distintos a una elección plebiscitaria", y que "esta asociación inconsciente sería una barrera al ejercicio libre y consciente del derecho al voto." Agrega que "un voto emitido en las circunstancias que he señalado no tendría el elemento de voluntariedad que supone y exige la sección 2 del artículo II de nuestra Constitución. La

preocupación principal del Estado y de esta Junta debe ser la de dar efecto a la voluntad expresa del electorado y propiciar que el elector dé su voto de acuerdo con los dictados de su propia conciencia."

## VIII

El Superintendente incluyó en su voto, a manera de conclusión de hecho, la afirmación de que durante la campaña plebiscitaria, para todo propósito efectivo, el electorado puertorriqueño no tuvo ante sí el emblema de la palma real, sino el emblema de *una palma*; y que en algunas ocasiones se utilizaba el dibujo de la palma de cocos en propaganda a favor de la Estadidad. Como ejemplo incluyó en el récord fotocopia de un anuncio que, según indicó, apareció en el periódico El Mundo, edición de 21 de julio de 1967. De ahí deduce que durante la campaña plebiscitaria la palma de cocos y la palma real eran la misma cosa.

En la fotocopia del referido anuncio unida al récord (que a máquina en su esquina superior izquierda dice "página 46, El Imparcial, 21 de julio de 1967") aparece un dibujo muy deficiente—que más bien puede catalogarse como caricaturesco o de humor—el cual, según su pie de imprenta, fue auspiciado por "Amigos del Estado Federado". Según certificación del propio Superintendente, en el Comité Directivo representativo de la fórmula de status "Estadidad", no figuró ninguna agrupación con el nombre de Amigos del Estado Federado. De un hecho aislado, no imputable a los representantes oficiales de esa fórmula de status en la campaña plebiscitaria, no puede establecerse una regla.

El hecho de que exista un periódico con el nombre La Palma, como vocero del Partido Nuevo Progresista (un ejemplar del cual, fechado el 23 de junio de 1968 y que dice "Vol. II—Núm. 2", incluyó el Superintendente en el récord) y en el que aparece al lado del nombre en la primera página,

el dibujo de una palma real; de que los dibujos o calcomanías de la palma real según manifestó el Superintendente "siguen apareciendo en los cristales de los automóviles e igualmente en las banderas de campaña", y de que durante una protesta organizada recientemente frente al edificio de la Junta Estatal de Elecciones "se tremoló la misma bandera que utilizaron a lo largo de la campaña"—nada de lo cual está prohibido por la ley—en nada detrae ni derrota el derecho a usar la insignia de la palma de cocos, que no es la palma real, en la papeleta electoral; ni detrae tampoco de ese derecho la declaración del Presidente del Partido Nuevo Progresista ante la Sala de Bayamón del Tribunal Superior— a que hicimos referencia anteriormente y de la que cita en su voto explicativo el Superintendente—ya que si, como cuestión de derecho, no hay ilegalidad en el uso de la palma de cocos como insignia en la papeleta electoral, ninguno de los hechos a que alude el Superintendente en su voto, puede producirla.

## IX

El voto del Superintendente—del que antes hemos citado *in extenso*—representa el esfuerzo sofisticado de un *Justitia* erudito, entrenado en los procesos técnicos de las varias escuelas de la metodología interpretativa, revestido con alguna pompa jurídica de la edad antigua.

La prohibición de la Sec. 26 de la ley de plebiscito es de carácter imperativo, lleva en sí misma el elemento compulsivo del *no hacer* y por eso debe ser interpretada restrictivamente en orden a no transgredir el derecho electoral del ciudadano en su expresión organizacional—que puede ser razonablemente regulado, pero no anulado. El principio *inclusio unius est exclusio alterius* es de aplicación a este caso para evitar la derogación del precepto específico de la ley, no por mera presencia en la metodología interpretativa estatutaria puertorriqueña del principio de "que cuando

la ley es clara y libre de toda ambigüedad la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu"—Art. 14 del Código Civil—sino por razón de la vigencia, bajo nuestro ordenamiento jurídico-constitucional, del superior principio de que un precepto de ley que pueda reprimir la libertad de organización política, en alguna de sus manifestaciones, como parte del derecho al sufragio, no debe ser extendido por fiat administrativo o por interpretación judicial, más allá de sus propios términos con el propósito de ampliar la prohibición expresa en ella contenida.

El criterio del Superintendente se funda en que aun cuando la insignia que representó en el plebiscito la fórmula de status Estadidad, se designó como "palma real" por la propia ley, la realidad es que para el elector común, "los dibujos representativos de una palma real y una palma de cocos son tan similares que fácilmente pueden confundirse" ya que "para todo propósito práctico, ambas insignias son la misma cosa", por lo cual, si se autoriza el uso del emblema de la palma de cocos, se estaría "pervirtiendo y desnaturalizando la intención legislativa que inspiró la prohibición establecida en el artículo 26 de la ley de plebiscito," intención que a su juicio iba "más allá de reducir en tres ejemplares [los usados en el plebiscito] el inventario de los posibles emblemas principales en la contienda electoral" pues estaba en juego "la garantía de un proceso electoral limpio y libre de confusionismos y la protección que merece el voto como instrumento cardinal de la democracia."

Nuestra democracia se nutre de las corrientes de la liberalidad, no de las corrientes de la represión. El Superintendente incurre en una mixtificación de conceptos, aplicando con inconsistente criterio restrictivo del derecho a la libertad del sufragio—que va a la esencia misma de los procesos de la democracia—limitaciones inconexas con el precepto expreso prohibicionista de la ley que se invoca, las cuales no tienen

otro efecto que producir una evidente regresión en la escala de valores de los derechos humanos.

No hay refinamiento eufemístico en la afirmación de que una palma de cocos no es una palma real. La diferencia entre una y otra—que existen a través de toda la isla—es de fácil captación a simple vista, y no es concebible que persona alguna pueda confundirse al mirar una y otra en su forma natural. Se ha insinuado, sin embargo, que al figurar una palma de cocos como emblema en la papeleta electoral, el tamaño a que habría de reproducirse se reduciría a tal grado que sería difícil distinguirla de, y fácilmente confundirla con, una palma real, que fue la insignia usada en el plebiscito a un tamaño mayor que el tamaño a que habría de ir en la papeleta electoral. El argumento carece de validez, porque si la insignia que se propone es la de una palma de cocos, el dibujo, retrato, grabado o reproducción que la represente en la papeleta electoral debe ofrecer a simple vista la diferencia que en su apariencia natural existe entre la palma de cocos y la palma real, y la identidad de la palma de cocos podrá apreciarse fácilmente en la papeleta, aunque los electores no sean botánicos.

La negativa del uso de la palma de cocos como insignia de un partido político en las elecciones generales de 1968 no se funda—porque ése no es el caso—en que la misma sea similar a la insignia de alguno de los demás partidos que van a concurrir a dichos comicios. La negativa se funda en que para el elector común el dibujo representativo de una palma de cocos puede fácilmente confundirse con el de la palma real, que fue la insignia usada en el plebiscito para representar una fórmula de status; en la asociación inconsciente por parte del elector en una elección general con el significado de una insignia parecida en el plebiscito, y en la tesis de coacción e involuntariedad que esa asociación inconsciente pueda operar en el voto del elector, en cuyas circunstancias no tendría éste el elemento de voluntariedad que

supone la Sec. 2 del Art. II de nuestra Constitución, que dispone "Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral."

Pero la tesis constitucional de *coacción o involuntariedad por asociación inconsciente* adolece de varias fallas. No se funda en la mera similitud entre una palma de cocos y una palma real en su reproducción gráfica en la papeleta electoral, cuya diferencia puede ser de fácil captación si el emblema de la palma de cocos se imprime correctamente en la papeleta. La tesis de asociación inconsciente y de coacción en el ejercicio de la prerrogativa electoral se funda, más que en la similitud en sí de las insignias, en un hecho que, según el Superintendente, proviene de la campaña plebiscitaria previa a la votación, o sea, que se usaron ambas palmas durante la campaña, y que los partidarios del status de Estadidad no decían "vote bajo la palma real" sino que el lema era "vote bajo la palma"; y se implica de este hecho que de permitirse el uso de la insignia de la palma de cocos en las elecciones de 1968 el lema sería el mismo, o sea, "vote bajo la palma", y de ahí la teoría de la confusión del elector y de la involuntariedad de su voto.

No puede construirse una tesis sobre violación al ejercicio consciente del derecho al voto, presuponiendo la inconsciencia de quien va a ejercitarlo. No puede darse a la prohibición legislativa connotación de castigo al ciudadano porque éste haya hecho uso en la campaña plebiscitaria de otros derechos constitucionales que le pertenecen y que puede usar incidentalmente en ese proceso electoral—como el de libertad de pensamiento, de palabra, de reunión, de prensa.

La Sec. 4 de la propia Ley Electoral (16 L.P.R.A. sec. 5) provee que "las elecciones se celebrarán con libertad e igualdad . . .", y el Art. 2 de la ley de plebiscito dispuso que éste se celebraría "en forma libre, imparcial y democrática."

Si bien en la ley de plebiscito se dispuso por el Art. 19 que no se incorporaría a la papeleta plebiscitaria ningún emblema oficial característico de un partido político, no se prohibió que los partidos políticos que concurrieran al plebiscito usaran y asociaran durante la campaña, junto a la insignia plebiscitaria representativa de su fórmula de status, sus propias insignias o emblemas oficiales característicos, excepto dentro de los colegios de votación o a un radio de menos de 100 metros de dichos colegios, según provisto por el Art. 86 de la propia ley de plebiscito.

Aceptar el argumento del Superintendente de *coacción o involuntariedad por asociación inconsciente* de permitirse en las elecciones de 1968 el uso de la insignia de la palma de cocos, por la similitud de ésta con la insignia de la palma real, sería aceptar que la Asamblea Legislativa—al permitir el uso en la campaña plebiscitaria, aunque no en la papeleta, de las insignias o emblemas oficiales característicos de los partidos políticos que como tales concurrieran a defender sus respectivas fórmulas de status—vició el plebiscito desde su incepción con el mismo estigma de involuntariedad sobre parte del electorado plebiscitario que ahora le atribuye, a la inversa, al uso en la papeleta electoral de 1968, de una insignia que no fue la que apareció en la papeleta plebiscitaria y que puede distinguirse de ella. Tal implicación debe ser rechazada. No podemos atribuir a la Asamblea Legislativa tal *brutum fulmen*. La posición de la Junta puede hacer daño innecesario a la imagen del plebiscito sobre el status político, sin hacerle tampoco bien a la imagen de la democracia electoral.

■ Por las anteriores consideraciones resolvemos que erró la Junta al declarar ilegal el uso de la palma de cocos como insignia de un partido político en la papeleta electoral de 1968.

## X

La decisión del Superintendente de que de permitirse el uso de dicha insignia, "la prelación la tiene el Partido Federal Unionista Agrícola, que fue el que se inscribió primero en el Precinto de Culebra", es igualmente errónea, por los siguientes motivos:

1—La carta de fecha 1ro. de agosto de 1967 de Modesto Rivera Ramos al Superintendente anunciándole el propósito de comenzar la inscripción de un partido político por petición llamado Federal-Unionista-Agrícola, con las cuatro insignias a que hicimos referencia en el apartado III de esta decisión (dos palmas de cocos entre ellas) no establece, en derecho, prioridad alguna a favor de dicha agrupación política sobre el Partido Progresista Federado que radicó en la oficina de la Junta Estatal de Elecciones en San Juan el 2 de agosto de 1967 a las 12:08 P.M. de ese día, 42 peticiones de inscripción de candidatos para el precinto electoral de Culebra con la insignia de la palma de cocos, entre otras.

De acuerdo con la Sec. 37 de la Ley Electoral la forma para nombrar candidatos por petición se inicia presentando "una petición a la Junta Estatal de Elecciones haciendo constar los nombres de los candidatos nombrados en la misma . . ."; y dichas peticiones "deberán radicarse en la oficina de la Junta Estatal de Elecciones no más tarde de las 12 del medio día del día primero de junio del año de las elecciones . . .". La carta de Modesto Rivera Ramos anunciando su propósito de comenzar la inscripción del partido Federal-Unionista-Agrícola, no cumple con las disposiciones citadas, ya que con ella no se radicó petición alguna nombrando candidatos, según requiere la ley, y no puede, por lo tanto, establecer por sí sola, derecho de prioridad sobre la agrupación que radicó efectivamente sus peticiones de inscripción en la Junta. Las primeras peticiones radicadas por la agrupación Federal-Unionista-Agrícola en la oficina

de la Junta Estatal de Elecciones, lo fueron el propio día 2 de agosto de 1967 a la 1:28 P.M., o sea, después de haberlas radicado la agrupación Partido Progresista Federado; y dichas peticiones, que fueron solamente dos, no correspondían al precinto de Culebra, y sí al precinto de San Juan I. No fue hasta el día 3 de agosto que la agrupación Federal-Unionista-Agrícola, radicó en la Junta las primeras peticiones de inscripción correspondientes al precinto de Culebra, que fueron cuatro.

■ 2—La agrupación Partido Federal-Unionista-Agrícola no radicó en la Junta peticiones de inscripción para cubrir el cupo numerario de 32 correspondiente al 10% necesario para la inscripción de candidatos locales en Culebra, hasta el día 27 de marzo de 1968. La agrupación Partido Progresista Federado había cubierto el cupo numerario correspondiente a dicho 10% en Culebra desde el 2 de agosto de 1967.

3—El Partido Nuevo, que en el mes de enero de 1968 quedó inscrito como partido por petición para todos los precintos electorales de Puerto Rico, por Asamblea General de delegados de los 87 precintos celebrada el 18 de febrero de 1968, acordó unirse con la agrupación política Partido Federal Progresista que ya había radicado en la Junta, según se ha dicho, sus 42 peticiones de inscripción para el precinto de Culebra, y que además, ya había radicado desde fines de agosto 870 peticiones para el precinto de Cataño, suficientes para cubrir el cupo numerario de 10% para quedar inscrito como partido local en dicho precinto. Acordó, además, como resultado de la unión, cambiar el nombre a Partido Nuevo Progresista y usar como única insignia la palma de cocos.

4—La agrupación política Partido Progresista Federado, en asamblea de sus miembros celebrada el 10 de marzo de 1968 acordó, por su parte, unirse con el Partido Nuevo para que existiera un solo partido bajo el nombre Partido Nuevo

Progresista y utilizar como única insignia la de la palma de cocos. Se adoptaron los acuerdos correspondientes para que desde que se llevara a cabo la fusión, unión o agrupación de ambos partidos en uno solo, el Organismo Directivo Central fuera el que en esa fecha tenía el Partido Nuevo.

5—El 19 de marzo de 1968 se reunieron los comités directivos centrales del Partido Nuevo y del Partido Progresista Federado y quedó consumada la unión, fusión o integración de ambos partidos, conforme a lo acordado separadamente por sus respectivas asambleas, ratificándose todos los acuerdos correspondientes.

6—Los documentos acreditativos de los acuerdos de dichas asambleas y de los organismos directivos centrales quedaron radicados en la Junta Estatal de Elecciones el 5 de abril de 1968.

7—Habiendo quedado consumada la integración del Partido Nuevo y de la agrupación Partido Progresista Federado el 19 de marzo de 1968, los derechos inscripcionarios adquiridos por la agrupación Partido Progresista Federado, en cuanto a nombre e insignia, derivados de su inscripción en el precinto de Culebra, se consolidaron en el Partido Nuevo desde la referida fecha. Por tal motivo el Partido Nuevo Progresista tiene derecho al uso de la palma de cocos como insignia por sobre la agrupación local Partido Federal-Unionista-Agrícola del precinto de Culebra.

8—Tanto por virtud de la consolidación de los derechos del Partido Progresista Federado en el Partido Nuevo, según se ha indicado, como por el mero consentimiento del primero en que éste adoptara y usara la insignia de la palma de cocos, es al Partido Nuevo Progresista al que corresponde dicho emblema contra la reclamación del Partido Federal-Unionista-Agrícola.

9—La reclamación hecha por el Partido del Pueblo el 29 de junio de 1968 del uso de la insignia de la palma de

cocos es improcedente por ser la del Partido Nuevo Progresista de mejor derecho.

Los motivos arriba apuntados establecen los fundamentos de hecho y de derecho por los cuales erró el Superintendente al adjudicar al Partido Federal-Unionista-Agrícola la insignia de la palma de cocos contra la reclamación del Partido Nuevo Progresista, el cual tiene derecho a usarla como su insignia electoral.[7]

*En virtud de lo expuesto, por la presente se revoca la decisión de la Junta Estatal de Elecciones de fecha 22 de julio de 1968, emitida por el voto del Superintendente General de Elecciones, y se declara que el Partido Nuevo Progresista tiene derecho al uso de la insignia de la palma de cocos, según propuesta a la Junta Estatal de Elecciones, para todos los fines electorales. Se ordena al Superintendente General de Elecciones llevar a cabo los trámites subsiguientes necesarios para que dicha insignia figure en la papeleta electoral de 1968 correspondiente a dicho partido.*

----

[7] A base de las conclusiones a que llegamos en esta decisión resultaría un mero *dictum* declarar que bajo el estado actual de la Ley Electoral y bajo los hechos específicos aquí concurrentes, el Partido Nuevo Progresista hubiera tenido derecho a figurar en la papeleta electoral de 1968 con la insignia de la palma de cocos, según propuesta, en todos los demás precintos de Puerto Rico, excepto el precinto de Culebra, en el cual podría nominar sus candidatos, pero no usar dicha insignia, en el supuesto de que la agrupación política Partido Federal-Unionista-Agrícola hubiere tenido mejor derecho al suyo sobre la insignia de la palma de cocos en dicho precinto, toda vez que la inscripción de una candidatura local surte efecto tan sólo en el precinto en que queda inscrita, y no puede tener consecuencias jurídicas electorales fuera de dicho precinto.