DEMOCRATIC PARTY, recurrente, *v.* TRIBUNAL ELECTORAL, recurrido.

*Número:* 0-77-144     *Resuelto:* 21 de marzo de 1978

2

*Juan M. García-Passalacqua, A. J. Amadeo Murga* y *Angel D. Ramírez,* abogados del recurrente; *Marcos A. Ramírez, Marcos A. Ramírez Lavandero* y *Donato Rivera de Jesús,* abogados del Tribunal Electoral; *Francisco Aponte Pérez,* abogado del Democratic Party of Puerto Rico.

PER CURIAM: En las elecciones generales celebradas en Puerto Rico el 2 de noviembre de 1976 uno de los partidos que concurrió lo fue el Democratic Party of Puerto Rico, un

**4**

partido local por petición que el Tribunal Electoral había certificado bajo dicho nombre en el Municipio de Culebra, y con la insignia de un asno, animal solípedo también conocido por burro, que en la papeleta electoral se presentó parado en cuatro patas, con las iniciales "DEM" en el lomo. En dichos comicios se emitieron en el precinto de Culebra un total de 562 votos para todos los candidatos al cargo de Alcalde, de los cuales la candidata de este partido local Sra. Juanita Feliciano Rosario obtuvo un (1) voto.

A las 12:03 de la mañana del 3 de noviembre de 1976, que es tres minutos de pasado el día de las elecciones, Franklin D. López, Angel D. Ramírez y Dan Sheley radicaron en la Secretaría del Tribunal Electoral una petición jurada en su carácter de electores constituidos en organismo directivo central, solicitando registro del nombre "Democratic Party" y la insignia de la cabeza de un burro sonriente, para un partido político que habría de participar en las elecciones de 1980 para el que se proponían solicitar reconocimiento y afiliación al "Democratic National Committee" de los Estados Unidos. No acompañaron las peticiones juradas por electores en el número exigido por el Art. 4-008 del entonces vigente Código Electoral (16 L.P.R.A. sec. 2138) (¹) pero anunciaron hallarse en el proceso de recolectarlas en precintos donde no

---

(¹) *Art. 4-008. Partido local por petición*

"Se considerará partido local por petición a cualquier agrupación de ciudadanos que a propósito de figurar en unas elecciones generales, en la papeleta electoral de un precinto, distrito representativo o distrito senatorial específico, se inscriba en el Tribunal Electoral como partido político local, y presenten los nombres y direcciones de un grupo de electores que constituyan su organismo directivo central, mediante la radicación ante el Tribunal Electoral, de peticiones juradas al efecto, suscritas en cada precinto en que deba aparecer su candidatura, por un número de electores no menor del cinco (5) por ciento de [*sic*] total de votos depositados, en cada precinto envuelto, para todos los candidatos al cargo de Gobernador del Estado Libre Asociado de Puerto Rico en la elección general precedente. Al aceptarse dichas peticiones por el Tribunal Electoral, el partido local por petición quedará inscrito.

existe partido alguno con el nombre "Democratic Party" o con insignia parecida a la propuesta para su agrupación.

A las 5:34 de la tarde de ese mismo día 3 de noviembre de 1976 Richard C. Durham, presidente del "Democratic Party of Puerto Rico", presentó al Tribunal Electoral solicitud para inscripción de dicho partido en el Municipio de Culebra, a la que acompañó 65 peticiones de inscripción suscritas por electores, y una lista de los que constituían el organismo directivo central del partido, para el que reclamaron el mismo nombre e insignia que habían figurado en la papeleta en las elecciones del día anterior.

El 8 de noviembre de 1976 la nueva agrupación "Democratic Party" completó un número de 121 peticiones suscritas por electores de Guaynabo y su abogado Lic. Angel D. Ramírez Ramírez solicitó que se certificara la agrupación como partido local para el precinto 9 de dicho Municipio por haberse cumplido con la exigencia del Art. 4-008 del Código Electoral de peticiones en número no menor del 5% del total de votos depositados, en el referido precinto 9, para todos los candidatos al cargo de Gobernador. Al día siguiente, 9 de noviembre, el Subsecretario del Tribunal Electoral notificó a Franklin Delano López la imposibilidad de inscribir su agrupación con el nombre y la insignia propuestos toda vez que los había usado previamente otro partido que el Tribunal Electoral no había descertificado. Tomando dicha advertencia como decisión del Tribunal Electoral, el "Democratic Party" por su abogado ahora Lic. Juan M. García Passalacqua pidió reconsideración y vista pública y ésta fue señalada para el 17 de enero de 1977.

"Dicho partido local podrá designar una candidatura, a través del procedimiento establecido a tal fin, en este Código, que estará compuesta únicamente por candidatos a los cargos electivos que puedan votarse en el precinto que corresponda."

Tiene su concordante en el Art. 3.001, inciso 4, de la nueva Ley Electoral que es la Núm. 4 de 20 de diciembre de 1977.

Para el 15 de diciembre de 1976 Durham informó al Tribunal que estaba en proceso de inscribir el "Democratic Party of Puerto Rico" en el Precinto Núm. 57 de Guayanilla([2]) y radicó una lista con los nombres y direcciones de los miembros del nuevo Comité Ejecutivo de dicha colectividad.

En la vista del 17 de enero de 1977 el Tribunal Electoral consideró todos los aspectos del caso, y atendiendo la petición del Lic. García Passalacqua para que el Tribunal descertificara al "Democratic Party of Puerto Rico" fundada en haber su candidata en Culebra obtenido un solo voto, que resulta ser menos del 5% del total de votos depositados en dicho precinto, expidió orden a dicho partido para que mostrara causa por la que no debía ser descertificado. Contestada la orden por el Lic. Francisco Aponte Pérez, quien a su vez promovió otra mostración de causa contra el "Democratic Party", contestada por el Lic. García Passalacqua, el Tribunal Electoral finalmente dictó sentencia el 23 de marzo de 1977: (a) reservando al "Democratic Party of Puerto Rico" el nombre e insignia que utilizó en las elecciones generales de 1976 en el municipio de Culebra; (b) descertificando dicha entidad como partido local por petición por no haber obtenido los votos necesarios para mantener su condición de partido inscrito, mas autorizándolo para continuar su proceso de inscripción como partido local por petición; (c) desestimando la petición del grupo presidido por Franklin Delano López para el uso del nombre "Democratic Party" y la insignia de un burro sonriente; prohibiendo a dicha agrupación([3]) el uso de dicho

---

([2]) De informes del Secretario del Tribunal Electoral al 14 de enero de 1977, aparece que el "Democratic Party of Puerto Rico" había presentado peticiones de inscripción en exceso del número requerido para quedar inscrito como partido local en los precintos 57 y 100 de Guayanilla y Culebra, respectivamente; y que el "Democratic Party" los completó en el Precinto Núm. 57 de Guayanilla, y en el Núm. 96 de Ceiba.

([3]) Aclaró el Tribunal que "la susodicha agrupación podrá utilizar cualquier otro nombre y cualquier otra insignia para inscribirse como partido por petición y participar en las elecciones de Puerto Rico, o en otras actividades electorales."

nombre e insignia, e instruyendo a la Secretaría del Tribunal que se abstuviera de procesar peticiones de inscripción de ésta ni de ninguna otra que se proponga adoptar nombres e insignias en conflicto de similaridad con los ya reconocidos por el Tribunal. (⁴)

---

(⁴) Por Resolución de 25 de junio, 1974 (T.E. 74-4) el Tribunal Electoral creó un Registro de nombres e insignias partidistas previamente registrados en la anterior Junta Estatal de Elecciones, entre ellos, nombre e insignia del "Democratic Party of Puerto Rico" que como se ha dicho figuró en la papeleta electoral para el precinto de Culebra, de cuya Resolución transcribimos:

"Examinadas las disposiciones de los Artículos 7-009 y 7-010 del Código Electoral de Puerto Rico, que requieren el registro de nombres e insignias que utilizarán los partidos políticos en la papeleta electoral y en el desarrollo de sus actividades, el Tribunal Electoral de Puerto Rico resuelve:

"(1) Ordenar a su Secretaría que abra un registro de nombres e insignias de partido, en el que inscriba los nombres de los partidos políticos con las insignias con las cuales han comparecido hasta la fecha y que se agregan como apéndice de la presente Resolución.

"Dicho apéndice servirá como Registro temporero que irá modificándose según los Partidos vayan radicando sus insignias oficiales en los colores y formas pertinentes. El Registro se abrirá con los Partidos que tenían radicada una insignia en la extinta Junta Estatal de Elecciones y que son los siguientes:

> Partido Popular Democrático:
> Partido Nuevo Progresista:
> Partido Independentista Puertorriqueño:
> Partido Socialista Puertorriqueño:
> Partido Estadista Liberal:
> Partido Demócrata de Puerto Rico:
> Partido Republicano Nacional:
> Partido Unión Puertorriqueña:
> Partido Constitucional:
> Partido del Pueblo:
> Partido Reformista:

"(2) A partir de la presente Resolución, toda persona interesada en inscribir el nombre o insignias de un partido radicará una solicitud jurada en la Secretaría del Tribunal Electoral en la que hará constar que actúa en representación de una agrupación de ciudadanos que se propone figurar en una elección, referendo o plebiscito; que el nombre o insignia que ha sometido no ha sido usado o adoptado previamente por otro partido político, en todo, en parte o parecido; que no usa ni usará como insignia formal o informal la bandera o el escudo de armas de los Estados Unidos o del Estado Libre Asociado de Puerto Rico; ni insignia alguna, o combinación de

Fundamentó su decisión el Tribunal en determinaciones factuales con las siguientes conclusiones de derecho:

"1. El Artículo 7-009 del Código Electoral requiere que el Tribunal rechaze 'cualquier nombre o insignia de un partido político . . . presentado para registro en su oficina,' que incluya '1. la bandera o el escudo de armas de los Estados Unidos o del Estado Libre Asociado de Puerto Rico.' '2. ni insignia alguna, o combinación de insignias, iguales o parecidas a las usadas por cualquier persona natural o jurídica, colectividad o agrupación, organizada con fines de lucro o no pecuniarios, en el Estado Libre Asociado de Puerto Rico.'

En el presente caso tenemos que el 'Democratic Party of Puerto Rico', que figuró en la papeleta electoral de Culebra, estaba y está inscrito en el Tribunal Electoral lo que requiere que consideremos si debemos protegerlo en el uso de dichos nombres [*sic*] e insignia.

---

insignias, iguales o parecidas a las usadas por cualquier persona natural o jurídica, colectividad o agrupación, organizada con fines de lucro o no pecuniarios, en el Estado Libre Asociado de Puerto Rico.

"(3) A partir de la presente Resolución todo partido político que quisiere cambiar su nombre o insignia deberá radicar ante la Secretaría del Tribunal Electoral una certificación al efecto de su organismo directivo central.

"(4) Toda solicitud de inscripción de nombre o insignia de partidos políticos o de cambio de nombre deberá radicarse en la Secretaría del Tribunal Electoral, a más tardar, sesenta (60) días antes del día de una elección, referendo o plebiscito.

"(5) La Secretaría del Tribunal Electoral sellará las solicitudes de inscripción de nombre e insignias de partido con la fecha y la hora de presentación. Si dos o más insignias iguales o parecidas, en todo o en parte, le fueren presentadas al mismo tiempo, el Tribunal Electoral decidirá por sorteo a cuál le corresponde la prioridad. Dicho sorteo se verificará en presencia de los procuradores electorales y de las partes interesadas.

"(6) La Secretaría del Tribunal Electoral rechazará cualquier nombre o insignia de un partido político que fuere presentado para registro que viole las disposiciones del Código Electoral. El Tribunal Electoral revisará todo dictamen de la Secretaría, motu proprio, o a petición de la parte, dentro de los diez (10) días siguientes a la notificación.

"(7) Las disposiciones sobre el registro de nombres e insignias de partido se aplicarán, en lo pertinente, a la insignia de todo candidato a senador o representante por acumulación.

"(8) Se ordena a la Secretaría que divulgue mediante edicto los términos de la Resolución."

2. El Artículo 7-010 del Código Electoral establece la norma de que la prioridad sobre nombres e insignias depende del orden de presentación en el Tribunal Electoral. Obviamente dicha norma rige en los casos de nombres e insignias que no han sido utilizadas anteriormente por ninguna agrupación política.

3. En los casos en los cuales la controversia versa sobre la propiedad de nombres e insignias, la estabilidad del proceso y el propio Código Electoral requieren que se reconozca el derecho a retener el nombre y la insignia hasta que la agrupación registrada los renuncie expresa o tácitamente. Es por ello que en los casos de los partidos Socialista Puertorriqueño y 'Democratic Party of Puerto Rico', expedimos órdenes para que se mostrasen las causas por las cuales no debíamos descertificarlos. Si no se contesta satisfactoriamente la orden de mostración de causa, evidenciando interés en la retención del nombre y la insignia para reinscribir la agrupación como partido y obtener la correspondiente franquicia electoral, el Tribunal procederá a descertificar la agrupación.

Es en ese momento en el que tendríamos que decidir si los nombres e insignias que se extinguen o desaparecen pasan al dominio público o si no podrían desenterrarse o rescatarse, como parece decir el Código Electoral.

4. La norma enunciada armoniza con las tradiciones electorales del país y promueve la equidad del proceso al liberar las agrupaciones políticas de la necesidad de distraer recursos en el período más crítico, que es el día de las elecciones generales, para retener el control del partido radicando documentos después de las doce de la noche.

5. Si se permitiese madrugar a las agrupaciones participantes en las elecciones, nos daríamos con el absurdo de que un partido político participante en el proceso no tendría representación en el escrutinio y que, adicionalmente, su procurador electoral quedaría huérfano de recursos humanos y facilidades físicas porque no procederían los pagos por el Estado en igualdad de condiciones con los demás partidos participantes.

6. A la luz de lo anterior, es obvio, como cuestión de derecho, que el 'Democratic Party of Puerto Rico', que participó como partido local por petición en Culebra, retiene su nombre y su insignia puesto que ha demostrado interés en retenerlos al radicar peticiones de inscripción en los varios precintos electorales de Culebra y Guayanilla.

7. Como el candidato del 'Democratic Party of Puerto Rico' al cargo electivo de mayor categoría dejó de obtener el 5% de todos los votos emitidos para la alcaldía de Culebra, tenemos que concluir, a la luz del Artículo 4-012 del Código Electoral, que ha dejado de subsistir como partido por petición.

8. El Subsecretario del Tribunal, Rafael A. Miranda Larrauri, actuó de conformidad con su obligación, de acuerdo con las resoluciones vigentes del Tribunal, al rechazar el nombre y la insignia propuestos por la agrupación que pretende utilizar el nombre de 'Democratic Party of Puerto Rico' en sustitución de la agrupación que concurrió a las elecciones. La letra de la ley es clara en el sentido de que la agrupación presidida por Franklin Delano López no puede utilizar un nombre idéntico al utilizado por otro partido político. Tampoco puede usar como insignia un burro, sonriente o serio, porque dicho símbolo fue utilizado por la agrupación que participó en las elecciones. El uso de nombres y símbolos en contravención del Código Electoral podría constituir una violación al Artículo 9-001 de dicho cuerpo legal y por tanto un delito público sancionable por pena de reclusión no mayor de seis (6) meses o multa hasta $500, o ambas penas, a discreción del tribunal.

9. Las normas evidenciadas en los párrafos procedentes [sic] no implican que Franklin Delano López y sus seguidores no pueden participar en la inscripción del 'Democratic Party of Puerto Rico' ya que la Carta de Derechos del Elector (Artículo 4-001 del Código Electoral, inciso 5) reconoce expresamente el derecho de todo elector a participar en la inscripción de partidos. A lo que no tienen derecho López y los demás es a inscribir otro 'Democratic Party' con un nombre e insignia registrados previamente a nombre de la agrupación original.

10. La Carta de Derechos del Elector reconoce (incisos 6 y 8) el derecho de los electores afiliados a participar en la formulación de los reglamentos internos y las bases programáticas de sus respectivos partidos y en los procesos deliberativos y de decisión. Aquellos seguidores del 'Democratic Party of Puerto Rico' que están inconformes con las gestiones del organismo directivo de la agrupación, pueden ejercer los derechos protegidos por la Carta de Derechos del Elector para alcanzar las posiciones directivas y lograr la mayoría en los organismos deliberativos. Como la Carta de Derechos del Elector es una institución novísima y singularísima, no tenemos precedentes para orientar a los elec-

tores. Eventualmente habrá que establecer las normas que nos dirán cuándo el tiempo está maduro para solicitar y obtener elecciones internas en un partido en proceso de certificación. Por ahora nos basta consignar, un cumplimiento de nuestra obligación de divulgar y gestionar afirmativamente la concreción de los derechos del elector, que Franklin Delano López y sus seguidores, así como sus rivales, tienen a su disposición la Carta de Derechos del Elector."

Recurrió la agrupación "Democratic Party" y acordamos revisar. Dicha parte recurrente descansa en los siguientes planteamientos:

"PRIMERO: Erró el Tribunal Electoral al aplicar un procedimiento de descertificación de partido que no está autorizado por el Código Electoral y es por tanto nulo.

SEGUNDO: Erró el Tribunal Electoral al dar vigencia de ley a una ficción jurídica, en violación de sus propios reglamentos y elementales principios de interés público.

TERCERO: Erró el Tribunal Electoral al ignorar jurisprudencia normativa bajo la Constitución de los Estados Unidos que ya antes había adoptado como suya."

En su alegato el recurrente "Democratic Party" discute en conjunto los tres señalamientos de error, pero pueden identificarse en el vasto campo de argumentación, dos planteamientos centrales: I, que la decisión del Tribunal Electoral contraviene el Código Electoral y los principios bajo los cuales ha de interpretarse y aplicarse; y II, que la decisión, en su interpretación del Art. 7-009 de dicho Código, es contraria a la Constitución del Estado Libre Asociado de Puerto Rico.

## I

Este recurso concierne esencialmente a la eficacia de los Arts. 7-009 y 7-010 [5] del Código Electoral de 1974, que transcribimos.

---

[5] Tienen sus concordantes en los Arts. 3.023 y 3.024 de la Ley Electoral de 20 diciembre, 1977, Núm. 4.

*Art. 7-009—*

"El nombre e insignia que usarán para distinguirse en la papeleta los partidos políticos principales, serán los mismos que usaron dichos partidos en las 'elecciones generales precedentes, a menos que se notifique un cambio de nombre o insignia al Tribunal Electoral, a más tardar, sesenta (60) días antes del día de una elección. También, antes de esta fecha, todo candidato a senador o representante por acumulación, deberá presentar al Tribunal una insignia sencilla y distinguible para que se coloque al lado de su nombre en la papeleta. Ningún partido político podrá adoptar como nombre o insignia, uno que hubiese usado o adoptado previamente otro partido político, en todo, en parte o parecido.

Ningún partido político usará como insignia formal o informal, en la papeleta electoral, ni en el desarrollo de cualesquiera de sus actividades o en materiales impresos de cualquier tipo: (1) la bandera o el escudo de armas de los Estados Unidos o del Estado Libre Asociado de Puerto Rico; (2) ni insignia alguna, o combinación de insignias, iguales o parecidas a las usadas por cualquier persona natural o jurídica, colectividad o agrupación, organizada con fines de lucro o no pecuniarios, en el Estado Libre Asociado de Puerto Rico.

El Tribunal Electoral rechazará cualquier nombre o insignia de un partido que fuere presentado para registro en su oficina, que infrinja las disposiciones de esta sección. Si cualquier partido político dejare de registrar una insignia en o antes de la fecha señalada, según se requiere por este Código, el Tribunal Electoral escogerá una figura geométrica como insignia para ese partido, la cual se usará para distinguirlo en la papeleta.

Cualquier partido político que quisiere cambiar su nombre o insignia podrá hacerlo mediante una certificación de su organismo directivo central, que se radicará ante el Tribunal Electoral, sin que por esto tal partido o candidato pierda los derechos y privilegios que la ley le hubiere concedido, o que hubiere adquirido, mientras utilizaba su anterior nombre o insignia." (16 L.P.R.A. sec. 2339.)

*Art. 7-010—*

"La prioridad en el orden de presentación de las insignias por partido político o candidatos se determinará por la fecha y hora

en que sean presentadas al Tribunal Electoral. Si dos o más insignias iguales o parecidas, en todo o en parte, le fueren presentadas al mismo tiempo, el Tribunal Electoral decidirá por sorteo a cuál de ellas corresponde la prioridad. Dicho sorteo se verificará en presencia de los Procuradores Electorales y de los candidatos o de sus representantes." (16 L.P.R.A. sec. 2340.)

Sostiene el recurrente que la prohibición dispuesta en el Art. 7-009 vedando la adopción del nombre e insignia previamente usado o adoptado por otro partido político, expira a medianoche del día de las elecciones generales, si el partido que tiene dichos distintivos registrados, desaparece como tal por no obtener el 5% de los votos requeridos por el Art. 4-012 [6] del Código Electoral; que al así desaparecer al filo de la medianoche su nombre e insignia reingresan al dominio público susceptibles de apropiación por quien primero las interese y reclame ante el Tribunal Electoral, a tenor del principio de "primero en tiempo, primero en derecho" del pre-citado Art. 7-010. Apoya su contención, además, en la autoridad de *Martínez Nadal* v. *Saldaña*, 38 D.P.R. 446 (1928) y *Barceló* v. *Saldaña*, 42 D.P.R. 226 (1931), para invocar la existencia de una "larga tradición" según la cual la reserva de nombre e insignia termina a la medianoche del día de elecciones.

Ordena el Art. 4-012 del Código Electoral:

"Cualquier partido político que tenga la categoría de partido principal de la mayoría, partido principal, o partido por petición, disfrutará de los derechos que le corresponda, bajo las disposiciones de este Código, hasta que su candidato para Gobernador del Estado Libre Asociado de Puerto Rico deje de obtener, en unas elecciones generales, el número de votos requeridos para subsistir como partido político, o en el caso de partidos locales por petición, hasta que su candidato al cargo electivo de mayor jerarquía, que hubiere figurado en su candidatura, deje de obtener, en unas elecciones generales, el cinco por ciento (5%) de los votos emitidos por todos los partidos, para todos los candidatos al mismo cargo, en el precinto o precintos relacionados con el mismo." (16 L.P.R.A. sec. 2142.)

---

[6] Art. 3.004 de la Ley Electoral de 20 diciembre, 1977, Núm. 4.

Los movimientos políticos no mueren de repente al llegar la medianoche. La pérdida de la franquicia electoral, determinable y ordenada en el Art. 4-012 del Código Electoral de 1974 sobre la base de insuficiencia de votos, no marca necesariamente la extinción del partido o agrupación bajo el cual se aglutinan unos electores de minoría con un programa, planes de gobierno e ideas para enfrentar la problemática del país. La tradición política, los usos y costumbres, a lo largo de nuestro ejercicio democrático, reconoce la subsistencia del partido minoritario como grupo que aún habiendo perdido la condición de partido político inscrito por no llevar a las urnas en una época el 10%, y hoy el 5% del total de votos depositados para determinado cargo, sobrevive la pérdida de su franquicia manteniéndose por la intensidad de su cohesión ideológica, como grupo de minoría con una voz respetable en el consenso de opinión pública general. La distinción reconocible en el Código entre la extinción del derecho a competir en la justa electoral y la extinción del partido como sector minoritario, viabiliza la abstención o retraimiento,[7] una reconocida táctica o recurso de lucha utilizada a principios de siglo para despertar la conciencia pública contra la parcialidad del ejecutivo que inclinaba la elección dando su poderoso respaldo a la colectividad de su preferencia. Nuestra experiencia política destaca al Partido Independentista Puertorriqueño perdiendo el día de los comicios su franquicia de partido principal, y restituido a tal condición en ocasiones por acción directa de la Asamblea Legislativa y en otras por la esforzada gestión de sus miembros recolectando el número requerido de peticiones juradas para una nueva inscripción. Frente a esta realidad de vitalidad post comicios de las agrupaciones políticas, es inaceptable la contención del recurrente de que la pérdida de personalidad oficial del partido, conlleva

---

[7] Nuestra historia reciente muestra al Partido Liberal derrotando una proposición de retraimiento de las elecciones de 1936, por solo un (1) voto.

la automática cancelación del derecho de sus miembros al nombre y a la insignia. La libertad de asociación de sus miembros bajo el nombre y emblema que invoca sus propósitos no caduca ni cesa súbitamente a las doce de la noche del día de las elecciones para dar paso a otro reclamo de libertad de asociación por un nuevo aspirante que va tras los mismos símbolos.

El recurrente hace hincapié en la anémica demostración del "Democratic Party of Puerto Rico" como partido local por petición en Culebra donde su candidata a Alcaldesa obtuvo sólo un voto. Ello no es de por sí excluyente de la posibilidad de que el partido haya decidido retraerse o votar bajo otras insignias. Tampoco el recurrente que quiere adoptar su nombre e insignia tiene historial electoral que indique su fuerza para obtener más de un voto en Culebra o en cualquier otro precinto.

El argumento del recurrente "Democratic Party" de que la preservación del nombre e insignia del "Democratic Party of Puerto Rico" más allá de las doce de la noche del 2 de noviembre de 1976, día de elecciones generales, equivale a auspiciar una ficción por ser dicho partido un mero frente o fantasma sin legitimidad política, carece de la calidad de hecho determinado sobre el cual fundamentar una conclusión. En el precinto Núm. 57 de Guayanilla, única área donde compitieron el grupo de López y el de Durham en la recolección de peticiones para nueva inscripción como partido local, este último obtuvo 44, contra 37[8] el recurrente lo que no debe tomarse como índice de que uno de los grupos sufra un mayor o menor grado de ficción. La debilidad del argumento estriba en el empeño de erigir un principio general sobre una circunstancia peculiar.

El nombre e insignia de un partido son los timbres heráldicos que trasmiten y despiertan en el electorado la no-

---

[8] Dato tomado de informe oficial del Secretario del Tribunal Electoral al 14 enero, 1977.

ción de su programa, sus ideales, sus principios, su historia y sus líderes. Esa noción no debe ser empañada por la confusión resultante de aprobar nombre e insignia parecidas para distintos partidos o agrupaciones porque conduciría a la legitimación del engaño como recurso de contienda política. La protección por los organismos directivos del proceso electoral del nombre e insignia de partidos inscritos constituye una tradición legislativa en Puerto Rico donde hasta el mismo día en que entró en vigor el Código Electoral de 1974, rigió la Sec. 42 de la antigua Ley Electoral, enmendada por Ley Núm. 4 de 18 de junio de 1924 (16 L.P.R.A. sec. 141) contentiva de la siguiente prohibición:

".　　.　　.　　.　　.　　.　　.　　.

Ningún partido político adoptará como nombre o emblema un nombre o emblema que se hubiese usado o adoptado previamente por otro partido político, en todo o en parte, si ese otro partido todavía reclama y usa dicho nombre o emblema.

.　　.　　.　　.　　.　　.　　.　　.　　.

El Superintendente General de Elecciones queda por la presente autorizado para negarse a aceptar y se le ordena que se niegue a aceptar cualquier nombre o emblema de un partido político que fuere presentado para su registro o archivo en su oficina que infrinja las disposiciones de esta sección."

Este texto fue incorporado en su esencia en el citado Art. 7-009 del Código Electoral de 1974 (16 L.P.R.A. sec. 2339) y aún hoy aparece preservado en el Art. 3.023 [9] de la nueva

---

[9] Artículo 3.023.—Emblemas o Insignias de Partidos y Candidatos.—

"Ningún partido político podrá adoptar, en todo o en parte, como nombre o emblema uno que previamente hubiese usado o adoptado otro partido político, así como ningún candidato podrá usar emblema alguno que sea igual al que hubiere sido previamente registrado por otro, si ese otro partido o candidato todavía reclama y usa dicho nombre o emblema.

"Ningún partido político o candidato usará como divisa en la papeleta electoral: (1) ningún símbolo, o combinación de símbolos que use en Puerto Rico cualquier persona natural o jurídica, colectividad, secta, religión, iglesia o agrupación con o sin fines de lucro, o que le distinga o caracterice, formal o informalmente en el desarrollo de cualesquiera de sus actividades o en sus materiales impresos de cualquier tipo; (2) divisa alguna que se asemeje o parezca, en todo o en parte, a lo enumerado en el

Ley Electoral (Núm. 4 de 20 de diciembre, 1977) protegiendo el nombre e insignia del partido más allá del día de elecciones en que deje de obtener los votos suficientes para mantenerse como partido inscrito, *si ese otro partido o candidato todavía reclama y usa dicho nombre o emblema.* La prohibición está predicada, no en la subsistencia o desaparición del partido, sino en la adopción o uso previo de los distintivos.

█ El Código Electoral no provee para la cancelación por abandono de los derechos adquiridos por un partido o agrupación a su nombre e insignia. Confrontado el Tribunal con la petición del grupo de López, recurrente, interesado en un nombre e insignia parecidos a los que había usado el "Democratic Party of Puerto Rico" en las recién celebradas elecciones y que continuaba usando en las peticiones para lograr su inscripción nuevamente como partido local, fue correcta su actuación convocando a vista pública en que después de oír a las partes afectadas y de recibir la prueba que éstas ofrecieron, llegar a una racional decisión en cuanto a si el nombre e insignia del "Democratic Party of Puerto Rico" no debían serle reservados bien porque no había ya grupo alguno de personas interesadas en retenerlos, o porque la agrupación que antes los usó los había abandonado. No compartimos la fuerte crítica del recurrente al llamado proceso de "descertificación" que superó un hiato en el procedimiento ante el Tribunal y que le permitió verificar la subsistencia del "Democratic Party of Puerto Rico" como grupo minoritario interesado en seguir participando en el proceso electoral.

█ No nos referiremos a los casos de *Barceló* v. *Saldaña* y *Martínez Nadal* v. *Saldaña,* supra, para otra cosa que ano-

---

apartado anterior; (3) la bandera o el escudo de armas del Gobierno de los Estados Unidos de América o del Estado Libre Asociado de Puerto Rico, o emblema, divisa o distintivo de cualquier agencia, departamento o instrumentalidad de éstos.

"La Comisión se negará a aceptar cualquier nombre o emblema de un partido político o candidato que fuere presentado para registro en su oficina, que infrinja las disposiciones de este artículo."

tar su discrepancia con la teoría propugnada por el recurrente de la pérdida súbita y automática la noche de elecciones de todo derecho a nombre e insignia. Aparte de los aspectos jurídicos hasta ahora aquí analizados, la contención del recurrente contra lo que llama ficción, resultaría en opciones prácticas de indubitable artificio. Un grupito emprendedor sin arraigo alguno en la opinión pública podría despojar de nombre y símbolo a cualquier partido de minoría que aún no logrando el 5% recibió en las urnas el voto de miles de electores. Este ardid produciría para sus ejecutores el efecto último de constituirlos en líderes y directores *de jure* de un partido cuyo electorado jamás le confió tales posiciones. No hay límite visible para los resultados grotescos, absurdos y torcidos a que conduciría la ausencia de protección por el Tribunal Electoral del nombre y la insignia de los partidos minoritarios más allá de las doce de la noche del día de las elecciones. Un partido socialista podría adquirir de la noche a la mañana una dirección fascista o un partido independentista podría amanecer dirigido, al menos de nombre, por los más recalcitrantes enemigos de la república. Un descontento derrotado en primaria podría en represalia "expropiar" la personalidad jurídica del partido con sólo ganar la carrera a la Secretaría del Tribunal Electoral. ¿Cómo exigir de un partido minoritario que desde la misma noche del día de las elecciones se dedique a preparar unos papeles o a tomar unas firmas si quiere subsistir como entidad política minoritaria identificada por determinado nombre e insignia, en carrera contra un adversario que puede eliminarlo del mapa político con sólo llegar primero en la madrugada? ¿Dónde queda la integridad de un sistema que impone a las agrupaciones minoritarias la obligación de luchar por su vida desde la noche misma de las elecciones enviando sus Notarios a tocar puertas en la madrugada para tomar las firmas en las peticiones en la esperanza de que pueda completarlas y radicarlas antes que las del grupo aspirante a su nombre e insignia? El

efecto es de comedia a primera impresión; de tragedia y de invalidez constitucional si se insiste en incorporar este procedimiento a nuestro sistema responsable por garantizar "la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto" y de proteger "al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral." Constitución, Art. II, Sec. 2; la radical frustración del derecho de los electores miembros de agrupaciones minoritarias a asociarse y organizarse libremente. Constitución, Art. II, Sec. 6.

▮ Lo hasta aquí resuelto excluye el acceso del recurrente a los distintivos del National Democratic Party, mas aún así hemos de dirigirnos a su reclamo de prioridad a tenor de la disposición en el Art. 7-010 del Código Electoral de 1974 preceptiva de que "la prioridad en el orden de presentación de las insignias por partido político o candidatos se determinará por la fecha y hora en que sean presentadas al Tribunal Electoral." Aparte de que dicha norma regula la adopción de nombre e insignia distinguibles de las que se hayan utilizado anteriormente (pues estas últimas se rigen por el Art. 7-009 del Código), el recurrente Democratic Party falló en presentar una petición de inscripción válida y suficiente en la cual descansar su contención de primero en tiempo, primero en derecho. Su petición presentada a las 12:03 A.M. del día siguiente al de elecciones no fue acompañada de peticiones juradas de electores en número bastante como lo requiere el Art. 4-008 del Código Electoral que ordena:

"Se considerará partido local por petición a cualquier agrupación de ciudadanos que a propósito de figurar en unas elecciones generales, en la papeleta electoral de un precinto, distrito representativo o distrito senatorial específico, se inscriba en el Tribunal Electoral como partido político local, y presenten los nombres y direcciones de un grupo de electores que constituyan su organismo directivo central, mediante la radicación ante el Tribunal Electoral, de peticiones juradas al efecto, suscritas en cada precinto en que deba aparecer su candidatura, por un nú-

mero de electores no menor del cinco (5) por ciento de [*sic*] total de votos depositados, en cada precinto envuelto, para todos los candidatos al cargo de Gobernador del Estado Libre Asociado de Puerto Rico en la elección general precedente. Al aceptarse dichas peticiones por el Tribunal Electoral, el partido local por petición quedará inscrito.

Dicho partido local podrá designar una candidatura a través del procedimiento establecido a tal fin, en este Código, que estará compuesta únicamente por candidatos a los cargos electivos que puedan votarse en el precinto que corresponda."

Son las peticiones de inscripción de los electores en el número exigido, y no la lista de directores, las que proyectan un apreciable indicio de la existencia de un grupo asociado para la actividad política. El grupo de Durham cumplió con este requisito antes que el "Democratic Party", presentando a las 5:34 P.M. del mismo 3 de noviembre con su carta-solicitud el número requerido de peticiones juradas.

■ Rechazamos la teoría del recurrente, basada en un *dictum* del Juez Presidente en *Partido Nuevo Progresista* v. *J.E.E.*, 96 D.P.R. 961, 988 (1968), en época en que este Tribunal no intervenía en la decisión de las apelaciones contra el Superintendente General de Elecciones, y en el cual se insinúa que la protección del nombre e insignia de un partido local por petición está restringida por los límites geográficos del precinto en que queda inscrito y que "[la inscripción] no puede tener consecuencias jurídicas electorales fuera de dicho precinto." La restricción niega el derecho de los partidos por petición a crecer desde su temprana etapa como partido local, a partido por petición en todo Puerto Rico (Art. 4-007 Código Electoral de 1974), una evolución natural que ha tenido lugar repetidas veces en nuestra experiencia democrática, y recurso del pueblo inconforme con los partidos establecidos. Este surgimiento de nuevos partidos por petición, de prevalecer el *dictum*, sería fácilmente dislocado por sus opositores sometiendo peticiones de testaferros con el nombre y la insignia del nuevo partido en distintos precintos de Puerto Rico, pro-

duciéndose tal dualidad en el uso de los mismos nombre e insignia por agrupaciones adversarias, que el proceso electoral quedaría sumido en confusión. Dejaría al nuevo partido la indeseable alternativa de inscribirse con un nombre e insignia distintos en cada precinto donde el adversario se le hubiese adelantado. La claridad y la legitimidad en la expresión de la voluntad del pueblo mediante el sufragio es consustancial con el reconocimiento de exclusividad en el uso de nombre e insignia en todo el territorio de Puerto Rico a todos los partidos por petición.

La parte recurrente mantiene que su nombre "Democratic Party" es distinguible, fuera de confusión, [10] del nombre de su grupo adversario "Democratic Party of Puerto Rico"; que en todo caso, la voz "Democratic" no debe ser objeto de permiso de uso exclusivo; y que hay un grado de apreciable diferencia entre su insignia de la cara de un burro sonreído, asomado sobre una cerca, y el mismo asno parado en cuatro patas que es la del "Democratic Party of Puerto Rico". Intenta superar la prohibición en el Art. 7-009 en su parte que dispone:

"Ningún partido político podrá adoptar como nombre o insignia, uno que hubiese usado o adoptado previamente otro partido político, en todo, *en parte o parecido*. (Bastardillas nuestras.)

A primera vista la diferencia para un elector de Puerto Rico es imperceptible. Permanece la impresión de que es el mismo partido "Democratic Party of Puerto Rico" cuyo nombre en ocasiones se abrevia a "Democratic Party", por lo que no es de esperarse en el elector una captación selectiva que separe el nombre completo de su abreviatura.

Dicha prohibición del Art. 7-009 debe contenerse dentro de límites precisos y términos reducidos, estrechamente ligados

---

[10] Tan extendida es el área de coincidencia entre uno y otro nombre que para proteger la claridad aún en esta misma opinión hemos tenido que identificar las dos agrupaciones en contienda por el nombre de sus presidentes Durham y López.

al interés apremiante en evitar confusión, para impedir que se desborde en privación del derecho de libre asociación. Fue dentro de ese marco de esmerado equilibrio que se emitió por el Juez Presidente Sr. Negrón Fernández la norma en *Giménez* v. *J.E.E.*, 96 D.P.R. 943, 955 (1968):

". . . [L]a similitud entre un nombre propuesto por un partido y un nombre que se usa por otro, debe ser de tal naturaleza que conlleven por sí mismos, ambos nombres, la impresión casi inequívoca a la vista y al oído—por la construcción análoga de ambos y su sonido casi idéntico—de que se trata del mismo nombre; no debe derivarse tal similitud del sólo contenido semántico de las palabras, sin más."

El Art. 7-009, aún de este modo restrictivamente interpretado, impide el uso generalizado del adjetivo "Democratic", ([11]) sobre el cual tiene reconocida prioridad el "Democratic Party of Puerto Rico" de Durham. Mayor connotación y universalidad que "Democratic" tiene en nuestro medio el gentilicio "puertorriqueño" y es indudable que para evitar confusión, hallándose registrados en el Tribunal Electoral los nombres de Partido Independentista Puertorriqueño y Partido Socialista Puertorriqueño, no podrá aprobarse la inscripción de agrupaciones que propongan los nombres Partido Independentista o Partido Socialista reclamando diferencia sólo a base de eliminar la palabra "puertorriqueño". No podrán escapar a la inferencia de abreviatura, por la "construcción análoga de los nombres y su sonido casi idéntico." *Giménez, supra.*

Tampoco hay suficiente diferencia entre las insignias en torno al motivo burro. Es hecho notorio del que podemos tomar conocimiento judicial que dicho animal es símbolo y

---

([11]) Sobre este particular no ayuda a la contención del recurrente la decisión en *Riddell* v. *National Democratic Party*, 508 F.2d 770 (1975), por la dificultad en descubrir el alcance de sus determinaciones y doctrina que de permitir la inscripción indiscriminada y sin límite de partidos con el nombre Democratic Party fomentaría la perplejidad, también sin límite del elector.

emblema del Partido Demócrata Nacional y como tal se le tiene y asocia en el vasto territorio de los Estados Unidos de América, bien se presente de cuerpo entero, parado en sus cuatro patas o asomado sobre una cerca y sonreído. Si la sonrisa es presidencial como reclama el recurrente, o una tipo Mona Lisa, y si el animal muestra toda su anatomía o sólo su cara, no son detalles que afecten la total identificación del burro con el Partido Demócrata en la imaginación de los electores. Tampoco variaría la imagen así integrada porque se presente un burro vestido en parte o con un sombrero entre las orejas. Los caricaturistas americanos han sido prolíficos en su presentación de innumerables figuras del burro, unas parado, otras echado y otras asomado, atemperando su posición y su semblante al momento político que vive el Partido. La clase de animal, y no su circunstancia es lo que genera el simbolismo, al punto que la figura del burro produce instantánea asociación de ideas con el Partido Demócrata. Ante estas realidades, la insignia propuesta por el recurrente no supera la prohibición de "parecido" del Art. 7-009 ni mucho menos ofrece al votante unos elementos de diferenciación.

## II

El Estado y el Tribunal Electoral, en su propósito de mantener la integridad del proceso electoral y evitar prácticas desquiciantes del mismo, tiene un legítimo interés en impedir correrías e incursiones hostiles mediante las cuales unos electores excluidos de una agrupación o partido político puedan mediante el simple recurso de anticiparse a presentar un número de peticiones de inscripción, apropiarse del nombre y la insignia de la agrupación. *Cf. Kusper* v. *Pontikes*, 414 U.S. 51; 38 L.Ed.2d 260; *American Party of Texas* v. *White*, 415 U.S. 767; 39 L.Ed.2d 744. El lenguaje del Art. I, Sec. 4 de la Constitución de los Estados Unidos que faculta a los estados para reglamentar la celebración de elecciones a menos que el Congreso actúe, comprende autoridad para aprobar un código

completo para elecciones congresionales. *Roudebush* v. *Hartke*, 405 U.S. 15; 31 L.Ed.2d 1.

■ La decisión del Tribunal Electoral protegiendo los derechos adquiridos del "Democratic Party of Puerto Rico" y la continuada libertad de asociación de sus miembros bajo dicho nombre y la insignia del burro, no plantea cuestión de restricción previa (*prior restraint*) del mismo derecho de asociación del recurrente "Democratic Party". El Tribunal Electoral no les obstruyó en su afán de registrar esos distintivos como suyos, sino que determinó que los mismos no estaban al alcance del grupo de López ni de ninguno otro porque ni nombre ni insignia habían retornado al dominio público. Quien los había adoptado y usado previamente todavía reclamaba su derecho primigenio. Dicho nombre e insignia no estaban congelados en un nicho de posteridad, intocables para cualquier partido o grupo que quisiere adoptarlos, sino por el contrario en uso y disfrute por la agrupación que los había ganado bajo el principio de prioridad del Art. 7-010 del Código Electoral.

■ El impacto del Art. 7-009 sobre la libertad de asociación es mínimo y casi ilusorio. Prohibir a una nueva agrupación que utilice el nombre e insignia, iguales o parecidos, que hubiese usado o adoptado previamente otro partido político tiene el limitado efecto de impedir a los nuevos aprovecharse del valor de sugestión, atracción y prestigio asociados a esos distintivos y no tiene más consecuencia que las variadas disposiciones regulativas contra el plagio. Exigirle originalidad a un nuevo partido en la selección de nombre e insignia es válido ejercicio del fundamental deber del Tribunal Electoral de proteger la integridad del proceso, excluyendo áreas de confusión de los votantes. Constituye un objetivo meritorio y hasta fundamental y apremiante cuando se canaliza por normas precisas y restrictas. Hemos sostenido en

esta opinión la facultad(¹²) del Tribunal Electoral para liberar y devolver al dominio público estos distintivos, luego de determinar su desuso y abandono por la colectividad que los obtuvo en primera instancia por lo que no existe posibilidad de que la prohibición del Art. 7-009 tenga efecto de eliminar a perpetuidad de la lista de opciones un nombre o insignia por el solo hecho de que en cierta ocasión perteneció a otro partido. Ni el derecho de asociación ni el de participar en actividades políticas es absoluto en ningún caso. *Civil Service Commission* v. *Letter Carriers*, 413 U.S. 548, 567 (1973); 37 L.Ed.2d 796, 810. El Art. 7-009, en su exclusión del uso engañoso de nombre e insignia propicia la legitimidad del sufragio emitido sin confusiones y provee protección del derecho de asociación de todas las partes en conflicto que reclamen para sí iguales o parecidos nombre e insignia de un partido político. Ni su letra ni su eficacia contravienen la libertad de asociarse y organizarse libremente para cualquier fin lícito salvaguardada por el Art. II, Sec. 6 de la Constitución del Estado Libre Asociado de Puerto Rico.

*La sentencia revisada será confirmada.*

Los Jueces Asociados Señores Rigau y Dávila no intervinieron. El Juez Asociado Señor Torres Rigual concurre en el resultado. El Juez Asociado Señor Negrón García emitió opinión concurrente y disidente.

—O—

Opinión concurrente y disidente del Juez Asociado Señor Negrón García.

---

(¹²) El Art. 2-007(L) (16 L.P.R.A. sec. 2027(L)) *in fine* instruye al Tribunal para que, en casos no previstos en la ley o en los reglamentos, resuelva conforme a equidad tomando en cuenta la razón natural de acuerdo con los principios generales del Derecho y los usos y costumbres generales establecidos.

La Ley Electoral de 1977 en su Art. 1.002(9) a su vez encomienda a la Comisión Electoral la estructuración de los procesos electorales.

San Juan, Puerto Rico, a 21 de marzo de 1978

Una democracia liberal nutre su fuerza creadora y renovadora no sólo del derecho individual a diferir, sino de darle plena oportunidad al opositor para que colectivamente, a través del debate político y las urnas, transforme su papel de crítico y adversario al de dirigente. Fundado en esta primacía, consignamos nuestra concurrencia y disenso sobre el examen de las interrogantes planteadas en torno a la juridicidad del dictamen del antiguo Tribunal Electoral y el alcance constitucional de varias disposiciones del Código Electoral derogado relacionadas con la formación, personalidad, subsistencia y derechos de partidos políticos, ello en contraposición a los derechos fundamentales de libertad de expresión, ideas políticas, asociación e igual trato ante la ley que reclaman unos electores. [1]

## I

A la luz de los hechos relacionados en la Opinión Mayoritaria del Tribunal, el análisis objetivo de los preceptos de ley que rigen la materia y doctrina jurisprudencial nos mueve a concluir que el Código Electoral taxativamente circunscribe la franquicia y subsistencia de todo partido político a que en la elección general precedente mantenga determinado por ciento de fuerza electoral; no cumpliendo con dicho requisito, desaparece como partido político *ipso jure*.

El texto del Art. 4-012 [2] es claro y terminante. No se refiere a "movimientos políticos" sino a partidos que se han

[1] Anotamos que al presente, en virtud de la nueva Ley Electoral— Núm. 4 de 20 de diciembre de 1977—las disposiciones en controversia son sustancialmente iguales.

[2] "Cualquier partido político que tenga la categoría de partido principal de la mayoría, partido principal o partido por petición, *disfrutará de los derechos que le corresponda, bajo las disposiciones de este Código, hasta que su candidato* para Gobernador del Estado Libre Asociado de Puerto Rico deje de obtener, en unas elecciones generales, el número de votos requeridos para subsistir como partido político, o en el caso de partidos locales

sometido sin éxito a la evaluación del electorado no importa lo respetable que sean como sectores minoritarios. Refleja un principio democrático clásico que parte de la premisa de que una "comunidad de hombres iguales y libres organiza su sociedad política con arreglo a la voluntad general y remite a ésta periódicamente las cuestiones públicas en controversia, así como las candidaturas para el ejercicio del poder político. La ciudadanía actúa en ambos extremos como árbitro final." 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, 2563 (Ed. 1961). Bajo este principio, se reconoce al Poder Legislativo facultad razonable para darle continuidad de partido político, en sus variadas categorías, a aquellos que no resultando victoriosos, demuestran en las urnas un mínimo de endoso. *Martínez Nadal* v. *Saldaña*, 38 D.P.R. 446 (1928). La fórmula vigente es de cinco por ciento (5%). A los otros, la ley les requiere que acrediten su fuerza exigiéndoles como prueba que se sometan al rigor de una nueva inscripción.

Resulta pues claro, que el pronunciamiento en contrario por este Tribunal y el foro recurrido—no importa sus loables propósitos, bajo el trámite denominado "descertificación"—es incorrecto; la franquicia electoral termina por ministerio de ley independientemente de la fecha en que se certifiquen los resultados finales oficiales del escrutinio. Como dijimos en *Martínez Nadal*, supra y *Barceló* v. *Saldaña*, 42 D.P.R. 226 (1931), la existencia legal de los partidos y sus nombres es "hasta el mismo día de las elecciones." (449, 251.) Contra esta conclusión no es oponible el argumento fundado en el derecho de los partidos políticos a participar limitadamente en el escrutinio general que se realiza con posterioridad a las

---

por petición, hasta que su candidato al cargo electivo de mayor jerarquía, que hubiere figurado en su candidatura, deje de obtener, en unas elecciones generales, el cinco por ciento (5%) de los votos emitidos, por todos los partidos, para todos los candidatos al mismo cargo, en el precinto o precintos relacionados con el mismo." (16 L.P.R.A. sec. 2142.) (Bastardillas nuestras.)

elecciones, al amparo de lo dispuesto en el Art. 7-082 que exige la invitación de ". . . los presidentes o sus representantes, así como a los Procuradores Electorales de cada uno *de los partidos políticos que han participado en la elección,* . . . para [sin voz ni voto] presenciar el escrutinio general", aun cuando poseen el derecho de inspeccionar las Actas de los Colegios de Votación (16 L.P.R.A. sec. 2412).

Frente a la regla general expuesta de que la franquicia electoral termina con las elecciones si determinado partido no logra el por ciento de ley prefijado, es perfectamente cognoscible que el Estado, por vía de excepción y en la consecución de ciertos objetivos restringidos de importancia—necesarios para garantizar la pureza y culminación ordenada del proceso electoral—reconozca *explícitamente* algunos derechos y deberes de los partidos difuntos para implementar varias disposiciones de la ley.([3]) No se da pues la situación consignada por el recurrido a base del fundamento de que al permitirse ". . . madrugar a las agrupaciones participantes en las elecciones, nos daríamos con el absurdo de que un partido político participante en el proceso no tendría representación en el

---

([3]) Además de la intervención en el escrutinio según el Art. 7-082, entre otros derechos y deberes post-electorales destacamos los contenidos en los siguientes artículos: el 3-003 que ordena—una vez certificado el resultado oficial de las elecciones—que el Tribunal "ajustará los estimados [de dinero recibido como anticipo del Fondo Electoral] a los resultados de las mismas . . . y ordenará al Secretario de Hacienda pagar o recobrar las cantidades correspondientes" (16 L.P.R.A. sec. 2083); el 3-004 que otorga un crédito para transportación de electores "el día de las elecciones generales" (16 L.P.R.A. sec. 2084); el 3-005, *in fine* que exige la devolución al Tribunal Electoral de todo equipo o propiedad adquirida por un partido político desaparecido con dinero proveniente del Fondo Electoral (16 L.P.R.A. sec. 2085); y el Art. 3-009(c) requiere de los partidos políticos sometan desde "el primero de marzo de un año de elecciones generales, hasta *el día último* de dicho año" los informes de contabilidad sobre ingresos y gastos (16 L.P.R.A. sec. 2089(c)).

Advertimos, no obstante, que por resultar tales derechos y deberes de índole excepcional, aquél que los reclama o invoca debe demostrar su existencia en virtud de disposición expresa estatutaria y no a base de inferencias conflictivas con el diseño electoral.

escrutinio . . . [ni] recursos humanos y facilidades físicas porque no procederían los pagos por el estado en igualdad de condiciones con los demás partidos participantes." Repetimos, para el escrutinio y pagos, el legislador reconoció ciertos derechos y obligaciones. Por el contrario, lo que resulta un contrasentido es que se extienda automáticamente más allá de las elecciones el privilegio de exclusividad en nombre y símbolo de un partido, como el *Democratic Party of Puerto Rico*, cuyo candidato local obtuvo un voto solamente, ello a base del concepto administrativo de "reserva".

Tampoco constituye razón para el trámite de "descertificación" el intento de promover ". . . la equidad del proceso al liberar las agrupaciones políticas de la necesidad de distraer recursos *en el período más crítico, que es el día de las elecciones generales*, para retener el control del partido radicando documentos después de las doce de la noche" o el de proteger la "integridad del proceso electoral . . . [para] impedir correrías e incursiones hostiles." En primer lugar, el argumento olvida que la franquicia electoral desaparece en las urnas. Segundo, ninguna petición de inscripción jurada antes o durante el día de las elecciones es válida; tiene que suscribirse con posterioridad a la medianoche. Y tercero, la norma se presta a conferir exclusividad de nombre y símbolo a grupos rechazados por el pueblo como supremo juzgador, sin que en número sustancial de peticiones juradas por ciudadanos se demuestre la fortaleza e interés legítimo.

Por todos es conocido que uno de los atributos inherentes que acompaña la personalidad y el reconocimiento de un partido político al amparo de la ley electoral es el de poseer un nombre y símbolo propios y exclusivos. Los principios regulatorios referentes a la posesión de nombres y símbolo electoral no son producto de inventiva legislativa ajena a los fenómenos psicológicos que nutren un pueblo. Responden a valores y realidades que trascienden el simple fundamento de

que toda criatura jurídica, al igual que una persona natural, debe ser identificada de algún modo.

Por naturaleza propia, individual y colectivamente el ser humano en el diario convivir tiende a identificarse con aquellas creencias y posiciones que satisfacen su ideario y espíritu; se comunica con sus congéneres y recibe de éstos mensajes e ideas, no solo por palabras sino a través de símbolos. Es natural pues, que en la etapa de organización de un partido político se aspire a lograr una correspondencia entre la combinación de palabras que forman el nombre pretendido y el diseño gráfico (emblema), de modo tal que con facilidad —visual y auditivamente—sea capaz de proyectar emocional o racionalmente por asociación mental, el contenido ideológico de los planes sociales, económicos y políticos que pretende someter al electorado. En la trayectoria histórica de los partidos políticos puertorriqueños, el significado de sus nombres, lemas y símbolos tuvieron sus orígenes en las controversias o circunstancias del momento; algunos capaces de trascender y perdurar, con mayor o menor efectividad, la época precisa de su génesis. Una vez establecidos, los nombres y símbolos partidista proyectan y "forman parte de la imagen pública que se crean a través de los años", justificándose que las leyes electorales los protejan contra toda usurpación indebida bajo normas iguales de prohibición. *Giménez* v. *J.E.E.*, 96 D.P.R. 943, 956 (1968).

Otro valor contemplado en la ley, derivado de la realidad humana expuesta, responde al interés lícito del Estado de prevenir la posible confusión del ciudadano en la contienda electoral y garantizar un proceso ordenado en todo cuatrienio eleccionario. Sobre el particular, no es menester mucha elaboración para demostrar el trastoque que conllevaría una campaña de inscripción o preeleccionaria, si las agrupaciones o partidos comparecieran ante la ciudadanía reclamando endoso a través de los distintos medios modernos de comunicación integrada y propaganda masiva, portando idénticos nom-

bres y símbolos. Podemos afirmar que más que un interés apremiante, existe el deber insoslayable de evitar la inscripción ilimitada de partidos políticos con el mismo nombre. (4) El interés de evitar confusión no sólo opera para beneficio de la ciudadanía en general, sino que revierte a las mismas colectividades quienes así se evitan el tener que dedicar y destinar parcialmente esfuerzo, dinero y tiempo esclareciendo sus respectivos orígenes y credenciales.

Finalmente, no debemos pasar por alto que la insignia colectiva e individual electoral, además de un instrumento mediante el cual se viabiliza la votación de candidatura íntegra, (5) como medio de comunicación representa uno de los mecanismos para distinguir en la papeleta los partidos y candidatos, y *garantizar el derecho constitucional del voto al elector que no sabe leer ni escribir.*

Reafirmamos nuestra posición de que bajo el estado de ley prevaleciente, el derecho a poseer el nombre y símbolos propios y exclusivos perdura mientras subsiste la franquicia; una vez cesa, se desvanece ese monopolio. Ni por gestión administrativa ni en función judicial, estamos autorizados, a extender después de las elecciones propiedad y dominio del nombre, bajo el concepto de "reserva", al *Democratic Party of Puerto Rico.* Como corolario, estimamos correcto el apun-

---

(4) En el ámbito federal la Constitución de Estados Unidos pone en manos de los estados la reglamentación de las elecciones. *Kusper* v. *Pontikes,* 414 U.S. 51, 57 (1973). "Además, como una cosa práctica, tiene que existir una reglamentación sustancial sobre elecciones si éstas van a ser justas y honestas y si alguna clase de orden, más bien que caos debe acompañar el proceso democrático." *Storer* v. *Brown,* 415 U.S. 724, 730 (1974). (Traducción nuestra.) Se ha sostenido que la reglamentación estatal obstaculiza el derecho al voto, así como la libre asociación, sería constitucionalmente sospechosa a menos que sirva un interés impelente del estado— *Cousins* v. *Wigoda,* 419 U.S. 477 (1975) ; *Storer,* supra, 729; *Dunn* v. *Blumstein,* 405 U.S. 330, 337 (1972) ; *Williams* v. *Rhodes,* 393 U.S. 23, 31 (1968)—sin embargo, esta norma no invalida automáticamente toda restricción al derecho al voto y asociación. *Storer,* supra, 729.

(5) Art. 7-012, *in fine* (16 L.P.R.A. sec. 2342).

**32**

tamiento del recurrente de que el *Democratic Party of Puerto Rico*, perdió la exclusividad del nombre e insignia al no recibir endoso en las urnas en número suficiente para perdurar más allá del día de las elecciones.

El recurrido argumenta que el lenguaje del Art. 7-009 (6) disponiendo que "ningún partido político podrá adoptar como nombre o insignia uno que hubiese usado o adoptado previamente otro partido político en todo, en parte o parecido", establece una prohibición absoluta que no tiene ninguna relación con el Art. 4-012 (7) que contempla la desaparición de partidos por insuficiencia de votos. Discrepamos. No podemos atribuirle a la Asamblea Legislativa incoherencia al legislar, como tampoco aceptar una interpretación desarticulada. El sentido armonioso e integral, congruente con las características hasta el presente jurisprudencial y estatutariamente

(6) En lo pertinente reza:

"Ningún partido político podrá adoptar como nombre o insignia uno *que hubiese usado o adoptado previamente otro partido político* en todo, en parte o parecido.

"Ningún partido político usará como insignia formal o informal, en la papeleta electoral, ni en el desarrollo de cualesquiera de sus actividades *o en materiales impresos de cualquier tipo:* 1. la bandera o el escudo de armas de los Estados Unidos o del Estado Libre Asociado de Puerto Rico; 2. ni insignia alguna o combinación de insignias iguales o parecidas a las usadas por cualquier persona natural o jurídica, colectividad o agrupación organizada con fines de lucro o no pecuniarios en el Estado Libre Asociado de Puerto Rico.

*"El Tribunal Electoral rechazará cualquier nombre o insignia de un partido político que fuere presentado para registro en su oficina que infrinja las disposiciones de este artículo."* (16 L.P.R.A. sec. 2339.) (Bastardillas nuestras.)

(7) "Cualquier partido político que tenga la categoría de partido principal de la mayoría, partido principal, o partido por petición, disfrutará de los derechos que le corresponda, bajo las disposiciones de este Código, hasta que su candidato para Gobernador del Estado Libre Asociado de Puerto Rico deje de obtener, en unas elecciones generales, el número de votos requeridos para subsistir como partido político, o en el caso de partidos locales por petición, hasta que su candidato al cargo electivo de mayor jerarquía, que hubiere figurado en su candidatura, deje de obtener, en unas elecciones generales, el cinco por ciento (5%) de los votos emitidos, por todos los partidos, para todos los candidatos al mismo cargo, en el precinto o precintos relacionados con el mismo."

reconocidas de una franquicia electoral, nos obliga a concluir que la prohibición plasmada en el Art. 7-009 está indefectiblemente conectada al Art. 4-012. La tutela de nombres y símbolos dimanantes de tal protección forzosamente tiene que referirse y cubrir aquellos partidos políticos debidamente inscritos al momento en que una agrupación de ciudadanos inicia ante el Tribunal Electoral las gestiones de inscripción *con arreglo a la ley,* irrespectivo de que estos últimos hubiesen acudido a las urnas electorales.

Tampoco compartimos la tesis de que la frase "si ese otro partido todavía reclama y usa dicho nombre o emblema"— que existía en la Sec. 42 de la Ley Electoral derogada, [8] predecesora del Art. 7-009 citado—refuerza la interpretación de que la prohibición es absoluta. El texto de ley se refiere a "ningún partido político", esto es, aquellos que poseen franquicia electoral. A lo sumo, repetimos, la única ampliación de cobertura que cabe razonablemente aceptar—en aras de un ordenado proceso inscripcionario—es que están también cobijadas aquellas agrupaciones que en trámite de inscripción conforme al Código registren debidamente el nombre y símbolo.

El no limitarse dicha prohibición a los nombres y símbolos del cuatrienio en que una agrupación de ciudadanos aspira adquirir personalidad y categoría de partido político, conduciría al resultado absurdo de establecer un interdicto legislativo categórico que podría perpetuar *ad infinitum* todo nombre o emblema usado en la historia del proceso electoral puertorriqueño. No negamos facultad a la Asamblea Legislativa para regular la cuestión; sin embargo, el elemento de contemporaneidad sería esencial. [9] En ausencia de normas

---

[8] En lo pertinente leía así:

"Ningún partido político adoptará como nombre o emblema, un nombre o emblema que se hubiese usado o adoptado previamente por otro partido político, en todo o en parte, *si ese otro partido todavía reclama y usa dicho nombre o emblema.*" (16 L.P.R.A. sec. 141.)

Lo subrayado representa lo derogado.

[9] Con respecto al argumento elaborado sobre el peligro de confusión entre el electorado porque una agrupación nueva sea inscrita con el nom-

claras y precisas legislativas revestidas de criterios igualitarios razonables que atemperen el rigor e impacto que ello impondría sobre el preciado derecho a la libertad de asociación de la ciudadanía, rechazamos la conclusión tajante que se nos propone por estimarla instauradora de un precepto negativo, incompatible con los atributos de personalidad—nombre y símbolo—que acompaña a un partido político mientras subsiste, pero que pierde al no alcanzar el endoso y confianza mínima del elector en las urnas.

## II

Establecido que el Democratic Party of Puerto Rico perdió su franquicia electoral, y por ende, el patrimonio al nombre e insignia después de la medianoche del 2 de noviembre de 1976, examinemos las consecuencias jurídicas que resultan del cuadro fáctico ante nuestra consideración.

Notamos que el recurrente Democratic Party apoya su derecho a usar dicho nombre y el emblema "cabeza de burro sonriente" de la petición jurada radicada a las 12:03 A.M. del 3 de noviembre. Dicha diligencia la efectuó en virtud de la Resolución del Tribunal Electoral del 25 de junio de 1974 (T.E. 74-4), creadora del registro y reserva de nombres, supra. Aduce el axioma "primero en tiempo, primero en derecho." En la Resolución impugnada el recurrido concluyó que el Art. 7-010 del Código "establece la norma de que la

bre que usó un partido político en elecciones anteriores, basta señalar que no podemos coincidir con la premisa de que "el electorado pueda identificar erróneamente al partido que está compareciendo en las elecciones generales con el partido que había comparecido en las elecciones anteriores como provocando la identificación errónea entre las dos agrupaciones."

El interés estatal fundamental reconocido de evitar confusión electoral, hemos dicho que necesariamente debe contener elementos de contemporaneidad. Este ingrediente de *actualidad* obviamente no está presente en el raciocinio que se nos ofrece, ya que entre una elección general y la próxima, por mandato constitucional, transcurren cuatro años; término más que suficiente para que cualquier segmento de ciudadanos "confundidos" despejen sus dudas.

prioridad sobre *nombres e insignias* depende del orden de presentación en el Tribunal Electoral. *Obviamente dicha norma rige en los casos de nombres e insignias que no han sido utilizados anteriormente por ninguna agrupación política.*" En este último aspecto, la determinación de aplicar la prioridad solamente a nombres y emblemas nunca usados es equivocada por ser incompatible con los efectos *ipso jure* que acompaña la desaparición de un partido político y el enfoque restrictivo que hemos rechazado. Sin embargo, merece comentario que el pronunciamiento implícitamente reconoce que la disposición 7-010 contempla también el mecanismo para decidir la prelación entre los partidos y candidatos adversarios, no sólo de insignias, sino *nombres*. Coincidimos en este extremo. Si el símbolo o insignia electoral representa la figura con que material y gráficamente se plasma el nombre de un partido, y ambos tienen como denominador común los mismos objetivos, comunicación e identificación, resulta lógico—en ausencia de otras normas legislativas—que la prioridad del nombre sea igualmente determinada en orden a su presentación.

Hecha esta aclaración, advertimos que el trámite de solicitud jurada realizado por los cuatro ciudadanos integrantes del organismo directivo del recurrente *Democratic Party* es uno sin virtualidad jurídica, ya que si bien siguió los términos de la Resolución T.E. 74-4, no fue acompañada de peticiones juradas suficientes como requiere el Art. 4-008 de la ley, que en lo pertinente dispone:

"Se considerará partido local por petición a cualquier agrupación de ciudadanos que a propósito de figurar en unas elecciones generales, en la papeleta electoral de un precinto, distrito representativo o distrito senatorial específico, se inscriba en el Tribunal Electoral como partido político local, y presenten los nombres y direcciones de un grupo de electores que constituyan su organismo directivo central, *mediante la radicación ante el Tribunal Electoral, de peticiones juradas al efecto, suscritas en cada precinto* en que deba aparecer su candidatura, por un número de electores no menor del cinco (5) por ciento de [*sic*] total de votos

depositados, en cada precinto envuelto, para todos los candidatos al cargo de Gobernador del Estado Libre Asociado de Puerto Rico en la elección general precedente. *Al aceptarse dichas peticiones por el Tribunal Electoral, el partido local por petición quedará inscrito.*" (Bastardillas nuestras.)

Su lectura refleja que para la inscripción de un partido local por petición hay que presentar *además* de los nombres y direcciones del grupo de electores que constituyen su organismo directivo central "peticiones juradas al efecto, *suscritas en cada precinto*", en número adecuado. Este requisito estatutario lamentablemente no fue contemplado en la Resolución T.E. 74-4.

Aun cuando dicha Resolución indujera a error al recurrente en su afán por adelantarse y lograr exclusividad del nombre e insignia interesados, no nos es permisible darle validez por ese fundamento pues nuestra decisión entrañaría el convalidar una determinación administrativa en pugna con la ley.([10]) Debe recordarse que la autoridad conferídale al Tribunal Electoral, aunque abarcadora, está sujeta "a que en las reglas que adopte concurran los siguientes factores: a) sean necesarias; b) *no conflijan con disposición expresa estatutaria;* c) intenten cubrir lagunas o áreas que no estén taxativamente comprendidas en la ley; y d) que la reglamentación

---

([10]) Tampoco tiene valor de precedente persuasivo el caso *Partido Justicia Puertorriqueña* (T.E. 75-36) mencionado por el recurrente. Este Tribunal Supremo nunca tuvo ante sí dicho caso, y menos aún, controversia sobre el trámite referente a la inscripción de un partido político y sus efectos sobre la exclusividad de nombre e insignia. Apreciamos sin embargo innumerables diferencias fácticas, entre las cuales sobresale que durante el término comprendido en que los promotores del *Partido Justicia Puertorriqueña* solicitaron el nombre sin petición jurada alguna el 30 de enero de 1975, y la fecha en que finalmente se le reconoció como partido local por petición en los precintos Hatillo (33), Santa Isabel (#70) y Culebra (#100) *ninguna otra persona o agrupación reclamó dicho nombre.* O sea, que la solicitud de inscripción original defectuosa—por no estar acompañada de peticiones juradas de inscripción en determinado precinto como lo requiere la ley—quedó subsanada al lograr presentar e inscribir el partido en tres precintos sin que mediara objeción de clase alguna.

se base en el concepto de equidad, aplicado conforme a los principios básicos del derecho, usos y costumbres establecidas." *García Passalacqua* v. *Tribunal Electoral,* 105 D.P.R. 49 (1976). (Bastardillas nuestras.)

La anterior conclusión es el reverso de los mismos razonamientos que apuntáramos con relación a la actuación *ultra vires* del Tribunal recurrido de extender la franquicia más allá del día de las elecciones. De la misma forma que resulta un contrasentido el que un partido político reclame preferencia cuando no ha obtenido la confianza del elector, es ilógico que una simple solicitud, aunque jurada,([11]) confiera en dicha etapa prelación y exclusividad si no viene acompañada de las peticiones de los electores que prima facie dan fe y evidencian numéricamente el genuino interés de participar en las elec-

---

([11]) A manera de paréntesis, nuestro criterio negándole vigencia a los trámites bajo la Resolución del Tribunal Electoral (74-4) representa uno de los fundamentos principales para refutar la hipótesis consignada en el alegato del Tribunal recurrido basado en el ejemplo de que al Partido Independentista Puertorriqueño ". . . un grupo de personas de otro partido de preocupados por el crecimiento del Partido Independentista Puertorriqueño desean hacer todo lo posible para impedir u obstaculizar ese crecimiento [y] *bajo la interpretación que propone el recurrente ese grupo de personas podría la noche de las elecciones radicar a las 12:01 de la madrugada una petición para inscribirse como partido político utilizando el nombre y la insignia del Partido Independentista Puertorriqueño* y el PIP se vería obligado a cambiar de nombre y la insignia lo cual tiene como consecuencia inevitable la confusión de los votantes en las elecciones." (Bastardillas nuestras.)

En primer lugar, el Partido Independentista Puertorriqueño retuvo la franquicia electoral en virtud del respaldo que obtuvo en las últimas elecciones, por lo cual sería especulativo elaborar una decisión sobre tal supuesto. Y en segundo término, es precisamente la Resolución del Tribunal Electoral antes mencionada la que permitiría que a las 12:01 de la madrugada posterior a las elecciones un grupo de personas deseosas de impedir u obstaculizar el crecimiento del Partido Independentista Puertorriqueño, con una simple petición jurada de registro acapararan el nombre e insignia tradicional de dicha colectividad. Esta eventualidad no es susceptible de ocurrir con nuestra decisión negándole virtualidad a tan sencillo trámite pues la solicitud tendría que venir acompañada de peticiones juradas suficientes según requiere el Art. 4-008, *supra.*

ciones. *Partido Nuevo Progresista* v. *J.E.E.*, 96 D.P.R. 961, 985–987 (1968).([12])

([12]) Tampoco es válida la teoría del recurrente de que la protección del nombre e insignia de un partido local por petición tiene efecto únicamente en el precinto en que está inscrito, la cual basa en la nota al calce (7) de *Partido Nuevo Progresista* v. *J.E.E.*, supra 988. Las expresiones aludidas con carácter *obiter dicta*, tienen que apreciarse "bajo los hechos específicos [allí] concurrentes" en que la disputa del símbolo era entre un partido estrictamente localizado en el precinto de Culebra—isla geográficamente separada del territorio principal de Puerto Rico—y un partido político inscrito en el remanente de nuestro territorio, culminada la actividad inscripcionaria del P.N.P., en una etapa en que no existía posibilidades de confusión.

Advertimos varias diferencias que cualifican las expresiones citadas al contenido fáctico de dicho caso. En primer lugar, en el que nos ocupa, la disputa de nombres y símbolos comienza y está latente desde el curso inicial inscripcionario de ambas agrupaciones. Segundo, no podemos abstraernos de que en el pasado—susceptible de ocurrir en el futuro—es posible que una agrupación de ciudadanos en determinado cuatrienio se inscriba primero como partido local por petición y posteriormente, a medida que va logrando mayor endoso y arraigo, expanda su proceso de inscripción a otros precintos hasta finalmente lograr el cupo numérico necesario para figurar en la papeleta electoral de todo Puerto Rico. Si limitáramos el derecho de nombre e insignia únicamente al precinto en que se inscribió originalmente, se vería obligado a inscribirse con otro nombre o insignia en los otros precintos produciéndose el efecto indeseado de confusión entre el electorado. En el panorama político puertorriqueño la consecuencia sería que un mismo partido tendría que inscribirse en distintos precintos con diversos nombres por precisamente existir previamente un *partido local por petición* con el nombre o símbolo que identifica a ese partido en otros precintos. Y adicionalmente, de acuerdo a la última redistribución electoral de la *Junta Constitucional de Revisión de Distritos Electorales, Senatoriales y Representativos*, fechada 3 de abril de 1972—implementando el mandato de igualdad "un hombre, un voto" (*one man, one vote*)—por imperativos jurídicos y del trasiego poblacional, para fines electorales, la Isla de Puerto Rico fue dividida en 113 precintos. (16 L.P.R.A. sec. 2143.) Como resultado, muchos de los precintos, en lo concerniente a límites geográficos, trascendieron linderos municipales y fraccionaron barrios, y en los municipios de grandes concentraciones poblacionales, quedaron ubicados un sinnúmero de precintos. Ante esta realidad, no es difícil imaginar el desconcierto que existirá si para fines inscripcionarios o de elección—habida cuenta de las redes integradas de comunicación moderna y masiva—no se vedara la duplicidad de nombres y símbolos políticos.

Recalcamos, lo expresado al calce como *dictum* en *Partido Nuevo Progresista* v. *J.E.E.*, supra, es válido en cuanto a la inscripción de un partido local por petición *que se estanca* en un precinto de las peculiaridades de la Isla de Culebra y que no se extiende como partido al restante territorio

En consecuencia, ciñéndonos a los términos de ley, las peticiones juradas radicadas con la carta del señor Durham en número adecuado para el precinto de Culebra el día 3 de noviembre de 1976, a las 5:34 P.M.—si bien posteriores a la solicitud jurada de los señores López, Lafont, Ramírez y Sheley—establecieron prioridad sobre cualquier otro partido respecto a la propiedad del nombre *Democratic Party of Puerto Rico* y el emblema del "burro" para fines inscripcionarios. En este extremo, aun cuando por distintos fundamentos, concurro con el resultado llegado en la opinión mayoritaria de que la decisión del Tribunal Electoral es correcta y debe ser sostenida.

### III

Lo expuesto no resuelve todas las interrogantes planteadas en el caso pues el recurrente argumenta la inconstitucionalidad de la decisión y además que:

"*El Democratic Party of Puerto Rico* no existe ni ha existido jamás como un partido electoral *bona fide*. Ha sido especialmente desde 1944, un frente del Partido Popular Democrático para participar a medias en la política nacional estadounidense

---

geográfico del país; ello no puede tener el efecto de impedir a una agrupación—que subsiguientemente adquiera status de partido por petición—acuda a las urnas con un nombre o símbolo análogos a aquel local. Sin embargo, esta conclusión no significa que para el desarrollo coordinado inscripcionario en el resto de la Isla de Puerto Rico, se prohíba la dualidad en nombres y emblemas. Más bien elimina la cuestionable y tradicional práctica de acudir a la Isla de Culebra para inscribir un partido local con fines exclusivos de monopolizar y perpetuar nombres y símbolos políticos; principio que encontró eco en otro caso ante el Tribunal Electoral en que dicho organismo calificó como "*hipocresía*" la "inscripción" como partido local por petición meramente para retener el nombre y las insignias sin la intención de acudir a las elecciones: *En el asunto de Hernán Cortés Ruiz*, T.E. 76-238.

Ciertamente es una afrenta a la seriedad del proceso electoral y un atentado a los postulados que inspiran el sistema democrático, que agrupaciones que el día de las elecciones no obtuvieron ningún endoso o uno insignificante, puedan irremediablemente acaparar al otro día un nombre y emblema contra el derecho de libre asociación del electorado restante de Puerto Rico.

a la vez que evita la afiliación formal de este último, que le crearía serios problemas divisionistas dentro de su grey, mayoritariamente autonomista y contraria a dicha afiliación. Su inscripción cada cuatro años como partido local en Culebra responde precisamente a la intención de 'proteger' ese nombre y la insignia nacional del burro para así *evitar* que cualquier grupo, en el libre ejercicio de su derecho de asociación, se inscriba y se afilie al Democratic National Committee para así participar de buena fe en las elecciones en Puerto Rico y en la nominación del Presidente y Vicepresidente de Estados Unidos.

*Es contrario al interés público proteger la existencia de una ficción jurídica específicamente para evitar el ejercicio del derecho de asociación política.* (Bastardillas en el original.)

El Código Electoral rige el proceso electoral en Puerto Rico. *El proceso de inscripción de nombres e insignias y la certificación de partidos se refieren a agrupaciones que se proponen participar en el proceso electoral.*" (Bastardillas nuestras.)

Nos señala además, que en ningún momento dicha agrupación alegó o admitió propósito electoral alguno.

El Tribunal Electoral en una Resolución fechada el 24 de diciembre de 1975 determinó que el *Democratic Party of Puerto Rico* era un partido *bona fide*. Sin embargo, es obvio que aun aceptando la corrección de dicha conclusión para aquella época, el carácter *bona fide* tendría que determinarse a la luz de las ejecutorias que logre en sus gestiones de inscripción post-electorales. ([13]) Para fines de esta ponencia, he-

---

([13]) Los informes oficiales del Secretario del Tribunal Electoral al 14 de enero de 1977 relativos a las peticiones de inscripción presentadas por ambas agrupaciones revelan el siguiente desglose:

DEMOCRATIC PARTY OF PUERTO RICO

| PRESC. NÚM. | PRECINTO | PETICIONES RADICADAS | VALIDAS | REQUERIDAS |
|---|---|---|---|---|
| 57 | Guayanilla | 44 | 44 | 35* |
| 100 | Culebra | 65 | 65 | 28* |
| | | | 109 | |

mos de asumir al presente que tanto el *Democratic Party of Puerto Rico* como el recurrente *Democratic Party* son agrupaciones que *bona fide* desean participar en nuestras elecciones del 1980, independientemente de las relaciones y consecuencias que ello pueda tener en los procesos internos de nominación de candidatos a la Presidencia y Vicepresidencia por el Partido Demócrata Nacional en los Estados Unidos. El Código Electoral derogado—único que rige la situación de autos—en lo que respecta a la franquicia de partidos políticos, y la correspondiente tutela de nombres e insignias electorales, se basa en la premisa de que éstos participarán real y efectivamente en la selección local y general de los funcionarios a puestos públicos electivos; no contempla que el único propósito sea el monopolizar nombres e insignias o el convertirse en instrumentos para participar indirectamente en la elección de funcionarios no locales cuyo derecho no está reconocido constitucional ni legislativamente al presente en Puerto Rico.

DEMOCRATIC PARTY (Recurrente)

| | | | | |
|---|---|---|---|---|
| 04 | San Juan | 90 | 73 | 1,684 |
| 09 | Guaynabo | 195 | 168 | 171 |
| 50 | San Germán | 102 | 93 | 175 |
| 57 | Guayanilla | 37 | 37 | 35* |
| | | | | ——— |
| 59 | Utuado | 261 | 244 | 864 |
| 82 | Guayama | 98 | 91 | 629 |
| 96 | Ceiba | 101 | 92 | 84* |
| | | | | ——— |
| 104 | Loíza | 167 | 156 | 361 |
| | | | | ——— |
| | | | | 954 |

Los asteriscos (*) representan los precintos en que completaron el cupo numérico de ley necesario para quedar acreditados como partidos locales por petición.

Incidentalmente, el desglose relacionado representa las únicas peticiones radicadas al 17 de noviembre de 1977 según nos certifica el Tribunal Electoral y son un indicio de la superioridad numérica en peticiones válidas radicadas por el recurrente.

Aun cuando causa extrañeza que ambos partidos preten-
dan apelar al electorado puertorriqueño—acostumbrado por
razones de idiosincracia y cultura a la versatilidad y rico con-
tenido del lenguaje español—haciendo uso exclusivo del idio-
ma inglés, y ello con miras a lograr su endoso en las próximas
elecciones, debemos resolver si el haberse omitido las palabras
"Puerto Rico" que identifican nuestro país, resulta suficiente
para distinguir efectivamente a ambas agrupaciones en el
proceso inscripcionario.

Según indicamos, el interés válido del Estado de evitar
la confusión de nombres y emblemas se extiende, además de
los partidos que retuvieron la franquicia electoral intacta, a
las agrupaciones en proceso de inscripción que aspiran lograr
el cupo numérico de ley necesario para adquirir por primera
vez o renovar la franquicia correspondiente. Resulta pues
inevitable que concentremos nuestra atención sobre el alcance
de la prohibición del Art. 7-009, que en lo pertinente reza:

> "Ningún partido político podrá adoptar como nombre o in-
> signia, uno que hubiese usado o adoptado previamente otro par-
> tido político, en todo, en parte o *parecido*. (Bastardillas nues-
> tras.)

El recurrente aduce que ". . . debe declararse el nombre
'Democratic' como de *dominio público* y permitir que el pro-
ceso político, mediante el voto directo y secreto, dilucide cuál
de esos grupos de Demócratas ha de prevalecer. Negarle el
uso de ese nombre a los recurrentes es una limitación incons-
titucional de su derecho a la libre asociación." La dificultad
del argumento estriba en que por propia definición, aquello
que es de "dominio público" no es susceptible de apropiación
por ninguna persona o entidad en particular. Y en el ámbito
de las palabras—como vehículo de expresión e ideas—es peli-
groso elaborar una teoría a base del concepto "dominio públi-
co" por el impacto restrictivo que tendría en la libertad.
Ahora bien, asumiendo que la tesis propugnada de "dominio
público" significa que el Estado no puede vedar para fines

electorales determinadas palabras—por ser éstas representativas de valores y tradiciones comunitarios en la historia de un pueblo—rehusamos aceptar tal conclusión por las consecuencias negativas que ello implica al ser aplicada en el caso de autos y en otros análogos. Si la palabra "Democrático"— traducción al vernáculo de "Democratic"—pudiere utilizarse irrespectivamente en la formulación del nombre de un partido, independientemente de su composición y examen total, (v.g. *Democratic Party* v. *Democratic Party of Puerto Rico*), por analogía, no habría fundamento alguno para que se prohibieran los términos "independentista", "socialista", "republicano" y otros. Así se evidencia la perplejidad que se crearía al presentarse ante el electorado, por vía de ejemplos, partidos locales o principales denominados: Partido *Independentista*, Partido *Independentista Puertorriqueño*, Partido Independentista de *Puerto Rico*, Partido Socialista, Partido *Socialista Puertorriqueño* y Partido Socialista de *Puerto Rico*.

Nuestro análisis refleja que el nombre *Democratic Party* obviamente está vedado de ser usado, no sólo por haber el *Democratic Party of Puerto Rico* logrado prelación en virtud del Código, sino por razón de asemejarse sustancialmente con este último. La identidad entre ambos nombres es indubitada ya que el nombre *Democratic Party of Puerto Rico* y el de *Democratic Party* pretendido, son iguales en sus dos primeras palabras; la única diferencia estriba en las palabras "of Puerto Rico". La identificación de la jurisdicción en que va a funcionar dicha colectividad, al igual que la de otros partidos bajo nuestras leyes electorales, está implícitamente comprendida ya que no concebimos como los electores, medios de comunicación y propaganda partidista puedan abstraerse de tal situación.

Sin embargo, nuestra interpretación del Art. 7-009, no puede ser una gramatical basada en el sentido literal del estatuto que afecte innecesariamente el derecho a la libre asociación de los electores. En la consecución de ese objetivo

apreciamos dicha prohibición a la luz de lo dispuesto en *Giménez* v. *J.E.E.*, supra, en que se sostuvo la doctrina aplicable del modo siguiente:

"La similitud entre un nombre propuesto por un partido y un nombre que se usa por otro debe ser de tal naturaleza que *conlleven por sí mismos, ambos nombres, la impresión casi inequívoca a la vista y al oído—por la construcción análoga de ambos y su sonido casi idéntico—de que se trata [casi] del mismo nombre....*" 955. (Bastardillas nuestras.)

El pronunciamiento de *Giménez* es perfectamente compatible y armoniza con el texto de ley vigente. La disposición no prohíbe que en el nombre sugerido o a adoptarse, se incluya o figure determinada palabra que sea idéntica o similar a la de un partido ya inscrito o en proceso de inscripción. Lo determinante es la composición íntegra de todas las palabras que forman el nombre. La totalidad del nombre será lo decisivo ya que si conlleva "la impresión casi inequívoca a la vista y al oído de que se trata del mismo nombre", su registro deberá ser rechazado por prestarse a confusión.([14]) Al adoptar esta interpretación reducimos al mínimo posible el impacto sobre la libertad de asociación y prédica de ideas políticas, balanceando a su vez los intereses gubernamentales envueltos. Amerita especial señalamiento que la interpretación brindada debe forzosamente tomar en cuenta y evaluar la *sigla* que resultará de la composición de palabras del nombre partidista deseado, con miras a evitar igual confusión al respecto.

---

([14]) *Riddell* v. *National Democratic Party*, 508 F.2d 770 (1975), en que el recurrente descansa para sostener que la palabra "Democratic" es de dominio público, es distinguible por su contenido fáctico, histórico y legal. No creemos que sea autoridad para sostener que las palabras "Democratic Party" sin más, tienen que ser reconocidas por el Estado para toda agrupación política que las reclame, si existe debidamente inscrito una agrupación o partido con igual nombre. Apreciamos su valor jurídico dentro de la norma adoptada de que el criterio rector es el examen de la totalidad del nombre propuesto para detectar si implica, a la vista y al oído, la impresión casi inequívoca de que se trata del mismo nombre.

En consonancia con el razonamiento expuesto, también por distintos fundamentos, consideramos que fue correcta la determinación del Tribunal Electoral no admitiendo el nombre del recurrente *Democratic Party*.

## IV

Ahora bien, disentimos de la negativa a reconocer el símbolo propuesto. Contra las consideraciones expuestas en la opinión del Tribunal para sostener tal dictamen, sometemos la cuestión a la inteligencia del lector (y elector) en virtud de un sencillo examen comparativo de los símbolos en controversia:

DEMOCRATIC PARTY          DEMOCRATIC PARTY
   (Recurrente)              OF PUERTO RICO

 

Sin necesidad de especular sobre otras posibles modalidades o variaciones en la figura del burro, las diferencias físicas entre el interesado por el recurrente y aquél presentado por el *Democratic Party of Puerto Rico* son "de fácil captación" a simple vista, *Partido Nuevo Progresista* v.

*J.E.E.*, supra, 983. Como medio efectivo de comunicación, "la totalidad de la cabeza del burro sonriente" solicitado como insignia, al ser contrastado con el símbolo del otro partido: (1) no se presta visualmente a confusión; (2) no son parecidos; y (3) mucho menos, idénticos. Debe recordarse que la percepción de los símbolos gráficos se logra por medio de la vista y no a través del uso del sentido auditivo o el de una fecunda imaginación.[15] Tampoco "puede construirse una tesis sobre violación al ejercicio consciente del derecho al voto, presuponiendo la inconsciencia de quien va a ejercitarlo." *Partido Nuevo Progresista*, supra.

La decisión negando el uso del símbolo sometido constituye una restricción indebida e irrazonable que vulnera los derechos constitucionales a libre asociación y expresión de los electores que componen la agrupación recurrente.

---

[15] No nos persuade la teoría de "asociación de ideas instantáneas" ante el electorado puertorriqueño a base de que el animal burro sea el símbolo y emblema tradicional y oficial del Partido Demócrata Nacional en los Estados Unidos ya que su virtualidad en nuestro país es de dudosa validez. Bajo la misma, podría impedirse el uso del símbolo "Jacho"—que distinguió en el pasado al Partido Socialista de Iglesias Pantín—debido a que al presente subsiste una generación de electores que lo asociarían "instantáneamente" con dicha ideología política.